530

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name SINGH Raghbir
(Last) (First) (Initial)

Prisoner Number D-54338

Institutional Address P.O. Box 689, Soledad, CA. 93960-0689.

///

FILED
MAR - 5 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Raghbir SINGH
(Enter the full name of plaintiff in this action.)

vs.

B. CURRY, Warden, et al.,
///
///
///
(Enter the full name of respondent(s) or jailor in this action)

CV

Case No. CRB
(To be provided by the clerk of court)

**PETITION FOR A WRIT OF HABEAS CORPUS**

(PR)

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

ORIGINAL

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Fresno Superior Court — 110 Van Ness, CA. 93724-0002

Court — Location

(b) Case number, if known 355671.

(c) Date and terms of sentence April 1987. 15years to life.

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes XX No ____

Where? Soledad, CA. 93960-0689

Name of Institution: Correctional Training Facility (CTF)

Address: P.O. Box 689, Soledad, CA. 93960-0689

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Second degree murder. (Cal. Pen. Code, § 187).

///

///

3. Did you have any of the following?

Arraignment: Yes XX No ____

Preliminary Hearing: Yes XX No ____

Motion to Suppress: Yes ____ No XX

4. How did you plead?

Guilty XX Not Guilty ____ Nolo Contendere ____

Any other plea (specify) ____________________

5. If you went to trial, what kind of trial did you have?

Jury ____ Judge alone ____ Judge alone on a transcript XX

6. Did you testify at your trial? Yes ____ No XX

7. Did you have an attorney at the following proceedings:

(a) Arraignment Yes XX No ____

(b) Preliminary hearing Yes xx No ____

(c) Time of plea Yes XX No ____

(d) Trial Yes XX No ____

(e) Sentencing Yes XX No ____

(f) Appeal Yes ____ No xx

(g) Other post-conviction proceeding Yes ____ No xx

8. Did you appeal your conviction? Yes ____ No XX

(a) If you did, to what court(s) did you appeal?

Court of Appeal Yes ____ No XX

Year: /// Result: ////

Supreme Court of California Yes ____ No XXX

Year: /// Result: ///

Any other court Yes ____ No XX

Year: /// Result: ///

(b) If you appealed, were the grounds the same as those that you are raising in this

petition? Yes ____ No XX

(c) Was there an opinion? Yes ____ No XX

(d) Did you seek permission to file a late appeal under Rule 31(a)?

Yes ____ No xx

If you did, give the name of the court and the result:

Not Applicable.

///

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal? Yes xx No____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I. Name of Court: superior Court Fresno.

Type of Proceeding: Petition for writ of habeas corpus.

Grounds raised (Be brief but specific):

a. Violation of XIVth Amendment.

b. Violation of XIVth Amendment.

c. Violation of VIIIth & XIVth Amendment.

d. Violation Vth & Xivth Amendment.

f. Violation of VIIIth Amendment.

Result: Deniedl. (See Exhibit N) Date of Result: 4-9-07

II. Name of Court: Fifth Appellate District Court.

Type of Proceeding: Petition for writ of habeas corpus.

Grounds raised (Be brief but specific):

a. Same as above.

b. ///

c. ///

d. ///

Result: Denied. (See Exhibit N) Date of Result: 5-31-07

III. Name of Court: California Supreme Court.

Type of Proceeding: Petitioner writ of habeas corpus.

Grounds raised (Be brief but specific):

a. Same as above.

b. ///

c. ///

d. ///

Result: Denied. (See Exhibit N) Date of Result: 1-28-08

IV. Name of Court: Not Applicable.

Type of Proceeding: ///

Grounds raised (Be brief but specific):

a. ///

b. ///

c. ///

d. ///

Result: /// Date of Result: ///

(b) Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes ____ No XX

Name and location of court: ____________

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

**Ground ONE: THE BOARD OF PRISON HEARING HAVE RESENTENCED PETITIONER TO STRAIGHT LIFE IN PRISON. THERE IS ABSOLUTELY NO "SOME EVIDENCE" TO SUPPORT THERE FINDING; THE BOARD'S ACTION VIOLATES PETITIONER'S DUE PROCESS, LIBERTY INTEREST IN A FAIR HEARING. (See Fourteenth Amendment, U.S. Const.; McQuillion v. Duncan, (9th Cir. 2003) 306 F.3d 896, 901-02; In re Minnis, (19-72) 7 Cal.3d 639; Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910.)**

**Supporting FACTS:**

On August 26, 2006, **DECISION (See** Exhibit A) parole consideration hearing, the Board denied him a parole release date, specifically using the commitment offense. (**See** Exhibit A, p. 1, lines 12-13, 18-19.)

The Board commissioner's violated Petitioner's due process rights, when they failed to set a parole date. Petitioner has an impecable record reveals **"no evidence"** what-so-ever to warrant the denial of parole. (**See** Exhibit A, p. 2, lines 9-26.) Petitioner has absolutely "no **serious or violent** CDC 115 disciplinary report." (**See** Id. p. 2, lines 21-22.) He has absolutely "**NO PRIOR criminal record**", and has **no** history of bad relationship, **no** juvenile record, yet other inmates that have severe criminal records are being ordered released by the state and Federal court.

Petitioner has accepted full responsibility for his crime and believes his conviction for second degree murder cannot be considered more aggravated or violent then the minimum necessary to sustain a conviction of second degree murder. The alleged evidence of horrendous and callousness relied upon by the Board to resentenced him to straight life, is wrong, and must be reversed.

Petitioner crime, or other unchanged criteria, affect the parole eligibility decision can only be predicated on the

"predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstances **per se** can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally replaced in the hands of BPH. While it would not be a constitution violation to forego parole altogether for **certain crimes**, what the state **cannot** constitutionally **do is** have a **sham system** where the judge promises the possibility of parole, but because of the nature of the crime, the BPH effectively **deletes** such from the system. Nor can a parole system, where parole is mandated to be determined on his future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the BPH commissioner revulsion towards the crime itself, or some other unchanged circumstance constitutes the **alpha and omega** of the decision **nobody** elected the Board commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstance must **indicate a present danger** to the community if released, and this can only be assessed not in **vacuum**, after two or three eligibility hearing against the backdrop of prison events.

According to <u>In re Lee</u>, (2006) 49 Cal.Rptr.3d 931, 936 state:

> "We conclude, however that the Governor erred. the **test** is not whether some evidence supports the reasons the Governor cites for denying parole, **but** whether some evidence indicates a parolee's release unreasonable endangers public safety." (Cal. Code, Regs., tit. 15, § 2402 (a).

In order for the Board to use the circumstance of the commitment offense and other static factors to actually be sufficient

evidence to support continual denials, there must be relevant and reliable evidence connecting these part events, circumstances, and behaviors to the determination of **current risk to public** safety.

It is not enough to "feel" or "believe" that Petitioner would pose a **mere** risk to public safety the evidence **must show** that he would pose an **unreasonable** risk to public safety (**See** CCR, tit. 15, § 2402 (a).) To this end, Petitioner asserts that the Board fails to show he would pose a current **unreasonable** risk of danger or threat to the public if he were release onto supervised parole, and therefore the writ **must be granted.**

Petitioner's August 5, 2004, parole hearing (**See** Exhibit B) where the Board granted a set parole date, which was later reversed by the Governor. Petitioner maintains that within the two (2) years from August 5, 2004, parole hearing where the Board **granted** parole, and the August 26, 2006, parole hearing, the Board in 2006 had the exact same record of facts before them and denied parole, when the 2004 Board evaluated the exact same evidence and found Petitioner suitable for parole.

In Rosenkrantz v. Marshall, (2006) 444 F.Supp.2d 1063, 1084, states:

> "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances after nearly two (2) decades of incarceration and half a dozen parole suitability hearing-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it **does not** satify the some evidence of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstance of his or her crime is nil." **Id.** at 1084; **also see** Johnson v. FINN, (2006) WL 195159 at p. 8, n. 3 (E.D.Cal. 2006).)

The **Question is**, the 2006 Board should have granted parole as the 2004 Board did, there is **absolutely** "no evidence" to supporting the Board denial for parole and a three (3) year denial on top of that. Therefore the Board is sentencing Petitioner to a straight life sentence, without parole.

For the foregoing reasons, the petition should be granted, because Petitioner's parole date has been once determine under California law, and because of the date (August 5, 2004) have long since passed, respondent should be directed to release Petitioner on parole. (**See** McQiullion v. Duncan, (9th Cir. 2003) 342 F.3d 1012, 1015-16.) (**See** In re Scott, (2005) 34 Cal.Rptr.3d 905, 907-927; In re DeLuna, (2005) 126 Cal.App.4th 585, 598-99; In re Ramirez, (2001) 94 Cal.Rptr.2d 549, 559-60; People v. Enriguez, (1977) 137 Cal.Rptr. 171, 177; Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 915.)

**Ground TWO: THE BOARD'S "UNREASONBLE RISK OF DANGER TO OTHER'S" IS A "PRESUMPTION OF UNSUITABILITY" IS NOT A VALID REGULATION AND IS A MISAPPLICATION OF STATUTORY AUTHORITY. (See Fourteenth Amendment, U.S. Const.; Wolff v. McDonnell, (1974) 418 U.S. 539; In re Minnis, (1972) 7 CAl.3d 639; Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910.)**

**Supporting FACTS:**

On Petitioner's August 26, 2006, parole hearing the Board found:

> "[T]he Panel reviewed all information received from the public and from you and relied on the following circumstance in concluding that you are not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. This offense was carried out in an especially cruel and callous manner in that the victim, your wife, Aranda Singh, twenty one years old female." (**See** Exhibit A, p. 1, lines 7-15.)

This "presumption of unsuitability" by the Board is not a correct determination: **(1)** the Board failed to follow its own

Rules and Regulations to determination of suitability **versus** unsuitability; **(2)** this finding was incorrect as it violated the judge verdict of second degree murder; **(3)** Petitioner's parole plans was improperly considered; **(4)** Petitioner's last legal residence was improperly considered and are not record of violent."

(**See** Exhibit C, p. 5, [**i.e. Future Plans,** A-C].)

As an example of this misapplication of the Board's own rules, the regulations relied on by Petitioner are stated in the **Determination** of Suitability Facts:

**Suitability Factors (CCR, tit. 15, § 2402 (d));**

**(1) NO JUVENILE RECORD: Petitioner has no** juvenile record of violent and/or any juvenile record. **(Applicable)** [**see** Exhibit C, p. 4, II. A].;)

**(2) STABLE SOCIAL HISTORY:** As Petitioner has previously noted and evidence, he has **strong** family support and ties, he has a vocation, support system and plans an on a family life, rather than irresponsible behavior. **(Applicable);**

**(3) SIGNS OF REMORSE:** Petitioner has admitted his responsibility in this crime and has further admitted that, in hindsight, the offense could have been easily avioloded. **(Applicable)** (**See** Exhibit D, pp. 49-51, lines 23-27, 1-27, 1-11; **also see** Exhibit C, p. 1, ¶ 4.)

**(4) THE MOTIVATION FOR THE CRIME:** the crime was **not** motivated by personal gain or influence was not related to criminal enterprise, **However,** the crime was result in significant stress in his life. **(Applicable) (See** Exhibit C, p. 2, [**Prisoner's Version], also see** Rosenkrantz, (2006);

**(5) LACK OF CRIMINAL HISTORY:** Petitioner has **no** criminal history and **no** history of violent crime. **(Applicable);**

**(6) AGE:** Petitioner has matured greatly in comparisons to his age at the time of the commitment offense and this greatly reduces the probability of recidivism, and his age now 67-years-old. **(Applicable)**;

**(7) UNDERSTANDING PLANS FOR THE FUTURE:** Petitioner has made realistic plans for the future. He has ongoing commitment by family to provide housing. Petitioner had his own janitorial

business, therefore, he has the knowledge to start his own business. **(Applicable)** (**See** Exhibit C, p. 5, [**II. Preconviction Factors C**];

(8) **INSTITUTIONAL BEHAVIOR:** Petitioner has constently demonstrated a positive asset and performed without aggressive or anger behavior. Petitioner was received into CDC in April 22, 1987, as of that date Petitioner as been disciplinary free for 20 years, and earn positive chrono, (**Applicable**) (**See** Exhibit C-E).

**UNSUITABILITY FACTORS (CCR, tit. 15, § 2402 (c));**

(1) **COMMITMENT OFFENSE, INCLUDING;**

**(A) No Multiple Victims:** there is **only** one (1) victim in this case (**Not Applicable**);

**(B)** The offense **was not** carried out in a dispassionate and calulated manner such as an execution stly murder (**Not Applicable**); **also see** Cal. Pen. Code, § 190.2 (a)(14);

**(C)** The victim **was not** abuse or defiled (**Not Applicable**);

**(D)** The offense **was not** an exceptionally callous disregard for human suffering. (**Not Applicable**).

According to <u>Scott</u>, decision at 891 states:

"[A]ll second degree murder by definition involve some calitivity, indiffernce to the feeling and suffering of other. As noted however, parole is the **rule** rather than the exception, and conviction for second degree murder **does not automatically render one unsuitable.**" (**Citing** <u>In re Smith</u>, (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655].)

(2) **PREVIOUS RECORD OF VIOLENT:** Petitioner has **no** previous record of violent (**Not Applicable**) (**See** Exhibit E, p. 4 [**XIV. Assessment of Dangerousness A-B**]);

(3) **UNSUITABLE SOCIAL HISTORY:** Petitioner has a very stable social history. (**Not Applicable**) (**See** Exhibit E, pp. **1-2** [**IV. Family History**]);

(4) **SADISTIC SEXUAL OFFENSE:** Petitioner has **no** sadistic sexual offense. (**Not Applicable**);

(5) **PSYCHOLOGICAL FACTORS:** Petitioner **has no** mental disorder and he **has** shown only great improvement in his attitudes. (**Not Applicable**) (**See** Exhibit E, p. [**XV. Clinician** Observations/ **Comment/Recommendations** 1-2]), States as follows:

"This inmate **does not** have a mental health disorder which would necessitate treatment either during his incarceration

period or following parole." (**Id. p. 4**)

The Board is putting Petitioner in an impossible situation by **demanding** proof of therapy which will **never** be **given** since there is **no** diagnosed need. Petitioner has consistently been rated in his doctor and counselors report as posing only **average or even low risk** to the public if release. The Board's decision to **ignore** the experts and announce a contrary finding, without any evidentiary support is a violation of due process.

A reminder to this court Petitioner was found suitable by the Board in August 5, 2004. The Board in August 5, 2006, has reviewed the **same evidence** this Board has reviewed in August 26, 2006. The main **question is** what changed? The answer is **nothing has changed.** Therefore, why is this Board finding Petitioner unsuitable?

Lets review the record of August 5, 2006:

> "The panel reviewed all the information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would **not pose** an unreasonable risk of danger to society or a threat to the public if release from prison." (**See** Exhibit B, p. 1, lines 7-12.)

The Board goes on and find the following: **(1)** Petitioner has **no** criminality either as a juvenile or adult offense (§ 2402 (c)(2), (d)(1); **(2)** Petitioner has a stable social history, with his family (§ 2402 (c)(3), (d)(2)); **(3)** Petitioner have severe medical problems **no** mental problems (§ 2402 (c)(5); The panel stated Petitioner need a date so that he can receive some of the medical care. (§ 2402 (d)(7).)

**(6) INSTITUTIONAL BEHAVIOR:** All of Petitioner's documented misconduct report has been minor in nature (**No Violence**) reported of misconduct in 1999 for returning late from yard

128-A counseling chrono (**Applicable**) (**See** Exhibit E, p. 4 [**XIV. Assessment of Dangerousness, A**]; **see** Exhibit A.)

Petitioner's 128 are for such minor indiscretion as returning late from the yard. Since that 128 **does not** reflect "serious misconduct" (§ 2402 (a)(6)) they are not factors tending to demonstrate unsuitability for parole, <u>In re (Mark) Smith</u>, (2003) 109 Cal.App.4th 489, 505.) The California Supreme Court in <u>In re Rosenkrantz</u>, (2002) 29 Cal.4th 616, repeatedly stated that the parole suitability **decision must be made on the basis of "specified factors."** (**See** <u>In re Rosenkrantz</u>, at 656, 658, 663, 667, 677.) The Board violated the law by relying on such minor factors.

The Board decision to deny parole under § 2402 (d)(8) states:

> "As to your parole plans, you have presented no viable residential plans in your last legal residence county, or that matter, anywhere else in California to this Panel today. (**See** Exhibit A, p. 3, lines 5-23.)

The Board **ignored** Petitioner's counselor's report where that writer stated: "Singh plans to reside with his sister, Ramrigie Bahalor, at 4528 E. Hoxie Ave., Fresno, Ca.. (**See** Exhibit C, p. 5 [**IV. Future Plans, A**].)

The Board has not given Petitioner a fair individual decision marking.

According to Department of Corrections Parole And Community Services Division by Arnold Schwazengger, Governor States:

> "The fact that you have **no** place to live or **work does not have a bearing on your release to parole.**" (**See** Exhibit F.)

Petitioner has extensive experience in the janitorial field. Petitioner had his own business in that field. (**See** Exhibit A.)

The Panel's conclusion Petitioner is not suitable for parole is
not demonstrated by the facts of his case and, in fact, the
oppsite true. Petitioner is more than suitable for parole release
and the Board should set his date. (**See** Cal. Pen. Code, § 3401,
**et seq.**)

In In re DeLune, (2005) 24 Cal.Rptr.3d 643, at 653 states:

"It reviewing a decision denying parole, we first determine
whether some evidence support each of the factors stated by
the Board to justify the denial of parole." (**cf. Rosenkrant**
supra, 29 Cal.4th 616, 677-83, 128 Cal.Rptr.2d 104, 59 P.3d
174; In re Smith, supra, 114 Cal.App.4th 343, 366-73, 8
Cal.Rptr.3d 655. **Als see** In re Cortinas, (2004) 16
Cal.Rptr. 3d 271, 268; In re Minnis, 7 Cal.3d 639; In re
Morrall, (2003) 102 Cal.App.4th 280, 292, 125 Cal.Rptr.2d
393.)

This Court must view the Board's reasons within the context
of the factors to see if some evidence shows Petitioner continues
to pose a unreasonable risk to public safety. (**see** In re Scott,
supra, 133 Cal.App.4th at pp. 594-595.) Applying that test, this
court will find no evidence that Petitioner is likely to commit
another crime or that his release would unreasonable endanger the
public. (**See** In re Lee, (2006) 49 Cal.Rptr.3d 931, 936-37.)

The Board has not shown **no** evidence that Petitioner is or
will be an unreasonable risk to public safety. His crime is over
20 years ago.

The record reflects Petitioner has meet all of the Board
substantial requirement of suitability under the rules of the
Board's and United States Constitution. Therefore, this court
should grant the Petitioner petition of habeas corpus and order
the Board to vacate its decision denying parole and thereafter to
proceed according with due process of law.

## CONCLUSION.

For the foregoing reason, the petition should be granted. Because Petitioner's parole date has been once determine under California law, and because that date August 5, 2004, have long since passed, the Board/Respondent should be directed to release Petitioner on parole. McQuillion v. Ducan, (9th Cir. 2003) 342 F.3d 1012, 1015-16 (affirming grant of relief on appeal after remand, and explaining that proper relief is iommediate release where no evidence in the record supported the BPT's determindion that the petition was not suitable for parole); Saif'ullah, 2005 WL 1555389 at 16.

**Ground THREE: PETITIONER CONTENDS THAT THE BOARD OF PRISON HEARING (BPH) VIOLATED "SOME EVIDENCE" IN DENYING PETITIONER'S PAROLE RELEASE DATE. (See Fifth & Fourteenth Amendment, U.S. Const.; In re Rosenkrantz, (2000) 8 Cal.App.th 871; In re Lee, (2006) 49 Cal.Rptr.3d 981; In re Elkin, (2006) 50 Cal.Rptr.3d 503.)**

**Supporting FACTS:**

On August 29, 2006, **DECISION** (**See** Exhibit A) parole consideration number seven (7) hearing, the Board denied him a parole release date, specifically using the commitment offense; especially cruel and callous manner, carried out in a dispassionate and calculated manner. (**Id.** A, p. 1, lines 12-19.)

The Supreme Court held in In re Rosenkrantz, that:

> "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to insure that the decision comports with the requirement of due process of law, but that in conducting such a review the court may inquire only whether **some evidence** in the record before the Board support the decision to deny parole based upon factors specified by the statute and regulation. If the decision's consideration of the specified factors is not supported by **some evidence** in the record and thus is devoid of a factorual basis, the court should grant the prisoner's petitioner for writ of habeas corpus and should order the

Board to vacate its decision denying parole and thereafter to process in accordance with due process of law."

The Board **has** not shown or stated any evidence that Petitioner is a unreasonable threat risk to the public. (**See** In re Lee, (2006) 49 Cal.Rptr.3d at 939 ["The test **is not** whether some evidence supports the reason the Governor cites for denying parole, **but** whether some evidence indicates a parolee's release unreasonably endangers public safety."], The Board states Petitioner commitment offense is especially cruel in manner therefore he is a threat to the public safety. (**See** Biggs, 334 F.3d at 916 ["continued reliance on an unchanging factors such as the circumstance of the offense could result in a due process violation of the prisoner continually demonstrates exemplary behavior and evidence of rehabilitation." Biggs, at 916.] The Ninth Circuit added that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system." at 917. In In re Lee, 49 Cal.Rptr.3d at 941 ["To deny parole, the reason must relate to defendant's continued unreasonable risk to public safety."] The Board failed to show some evidence that Petitioner is a threat to the public safety.

Petitioner was received into CDC in April 22, 1987. Here it is 20 years later. In that time frame Petitioner has a spotless discipline record except for one, late from yard violation was a counseling chrono 128-A. He also improved himself by taking adult education classes. Petitioner has never committed a violent act or engaged in any other conduct warranting discipline. He has

completed every therapy and self-help programs available, (**See** In re Weider, (2006) # H030203 [DAR December 6, 2006 at 15800] "We conclude that there is no evidence to support a finding that Weider's failure to participate in a substance abuse program while in prison makes him unsuitable for release on parole.") and has completed a vocational trade. (**See** Exhibit A, p. 2, lines 10-12.; **also see** Exhibit M.)

While relying upon Petitioner's crime as a indicator of his **dangerousness** may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstance after **two** decades of incarceration and half a dozen parole suitability hearing violates due process because Petitioner's commitment offense has become such an **unreliable predictor** of his present and **future** dangerousness that it **does not satisfy** the **"some evidence** standard. After twenty (20) years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his crime is nil. (**See** Johnson v. Finn, (2006) WL 19519 at 8 n. 3 (E.D.Cal.)( stating that "the seriousness of the crime had predictive value for the dangerousness of Petitioner's release for the fist, second, perhaps third suitability hearing. But as the years go by, this factor loses it predictive value in light of the growing experience to the contrary (assuming Petitioner's record in prison is exemplary").) Irons, 358 F.Supp.2d at 947 n. 2; Rosenkrantz v. Marshall, (2006) 444 F.Supp.2d 1063, at 1084.)

It has been 20 year since Petitioner committed the murder. As found by the 2004 hearing panel, Petitioner done everything he

could while in prison to better himself. (**See** Exhibit B.) Under these

circumstances, the nature of the offense had lost any predictive value and the continued reliance on it to find Petitioner unsuitable violates his due process. (**See** Roesnkrantz v. Marshall, (2006) 444 FD.supp.2d at 1086-87.)

There is **no** reliable evidence supporting the Board's conclusion that Petitioner is unsuitable for parole, that determination violates due process. (**See** Hill, 472 U.S. at 455; Lee, (2006) 49 Cal.Rptr.3d at 936; **also see** In re Deluna, (2005) 126 Cal.App.4th 585, 591, 24 Cal.Rptr.3d 655; In re Cortinas,(2004) 16 Cal.Rptr.3d 271, 286; Thomas II v. Brwon, (2006) #C-05-1332 MHP (pr) (N.D.Cal. Dec. 21, 2006 at pp. 4-5, 7, [order granting habeas Petition]); Saif'ullah v. Carey, (2005) (E.D.Cal. # CIV-S-02-2664-MCE-DAD-P); Martin v. Marshall, (2006) # C-05-3486 MHP (N.D.Cal. 2006); Masoner v. State, (2004) WL 1080177 at p. 1-2 (C.D.Cal. 2004.)

**Ground FOUR: PETITIONER'S 20 CALUALENDER YEARS SENTENCE FOR 15-TO-LIFE COMMITMENT OFFENSE IS NOT PROPORTIONATE TO HIS CULPABILITY FOR HIS OFFENSE IN VIOLATION OF STATE AND FEDERAL PROHIBITION AGAINST CRUEL AND/OR UNUSUAL PUNISHMENT. (See Eighth & Fourteenth Amendment, U.S. Const.; Cal. Const., Art. I, § 17; Solem v. Helm, (1983) 465; In re Lynch, (1972) 8 CAl.3d 410, 414.)**

**Supporting FACTS:**

Petitioner was received into the Department of Correction on August 22, 1987.

On August 29, 2006, Board found that Petitioner was a danger to society and that he in unstuiable for parole. (**See** Exhibit A, **see also** Cal. Pen. Code, § 3041, subd, (b).) Petitioner was found

to be unsuitable for parole release for a additional three (3) years. (**See** Exhibit A, , **also see** Cal. Pen. Code, § 3041. 5.)

Petitioner received a one (1) year denial at his 2003 Board hearing (**See** Exhibit J), Petitioner received a parole grant at his 2004 Board hearing (**See** Exhibit K); Petitioner received a one (1) year denial at his 2005 Board hearing (**See** Exhibit L); and his 2006 Board hearing Petitioner received a three (3) years denial. (**See** Exhibit A).

In <u>In re Inez Tito Lugo</u>, ( ) Marin County **#SC135399A** First Appellate District States:

> "...prohibiting BHP panel from issuing multi-year setoffs (after a 1-year setoff or a parole grant...")

There is no change in Petitioner circumstances to warrant a three (3) year denial. Therefore, the Board is violating Petitioner right to his equal protection.

As a result of the combined action by the Board, Petitioner sentence is to least equal to the sentence recommend by the Board's regulations. (**See** CCR, tit. 15, § 2403 (c), "11-C [Contribution."] By the regulation, the "Recommended Based Term" for Petitioner 18-19-20; when in fact this actual sentence, plus the three (3) years offset before he can again reapply for leniency is 23 canlender years with addition port-conviction credits this (assuming good behavior) this would be 28 years (**See** CCR, tit. 15, § 2410), which is the max-term for first degree murder which Petitioner was not sentenced to.

Petitioner is already 6.6 years past his release as of August 5, 2004 parole grant. (**See** Exhibit B.) Once the Board determined that Petitioner was suitable for parole, it calculated

his term and assessed a total period of confinement of 228 months. Post-Conviction credits give Petitioner from April 22, 1987 to August 5, 2004 which was 68 months. The Board than subtracted 68 months from 228 to get a total of 160 months. Petitioner total period of confinement is 13.4 years. (**See Id.** B, p. 8.) The significance of this calculation is that because the Board decision **was not** supported by "**some evidence**" this court need not send this matter back to the Board to set a term for Petitioner, the Board has already done so. (**See** Johnson v. Finn, (2006) WL 195159 at 8; T%homas II v. Brown, (2006) C-05-MHP (pr) (N.D.Cal.) at p. 16 Saif'ullah v. Carey, (2005) (E.D.Cal. CIV-S-02-2664-MCE-DAD-P; Martin v. Marshall, (2006) C-05-3486 MHP (N.D.Cal.); Rosenkrantz v. Marshall, (2006) 444 F.3d 1063, 1085-87.)

///

///

///

**Ground FIVE: BOARD OF PRISON HEARING VIOLATED PETITIONER' LIBERTY INTEREST IN A PAROLE RELEASE BY CONTINUES RELAYING ON UNCHANGING FACTORS. (See Fifth & Fourteenth Amendment, U.S. COnst.; CAl. Const., Art. I, §§ 7 & 15; McOuillion v. Duncan, (9th Cir. 2003) 306 F.3f 895; Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 914-15.)**

**Supporting FACTS:**

Petitioner Board found that he continues to "pose unreasonable risk of danger top society if release to parole," after 20 years of rehabilitation incarceration and six (6) parole denial deprived him of his constitutional **liberty interest** in parole release and violated his right to due process as afforded him by the United States Constitution and Fifth & Fourteenth Amendment. **(1)** the finding of continued threat to society **was not** supported by **"some evidence,"** (**See** In re Lee, (2006) 49 Cal.Rptr.3d at 931 ["The test is not whether some evidence supports the reason the Governor cites for denying parole, **but** whether some evidence indicates a parolee's release unreasonable endangers public safety.".] **also see** Rosenkrantz v. Marshall, (2006) 444 F.Supp.2d at 1081); **(2)** the finding was based upon unchanging factors (such as commitment offense), (**See** Rosenkrantz v. Marshall, (2006) 444 F.Supp.2d at 1084 ["While relaying upon Petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstance after two decades of incarceration and half a dozen parole suitability hearing - violates due process because Petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it **does not** satisfy the "some evidence" standard."], which lacked a reasonable predictive valve relevant

to the question of Petitioner's current dangerousness; and had been used to deny parole six (6) prior occaions (**See** Exhibit G-L); **(3)** the finding **was not** based upon evidence relevant to Petitioner's current risk to the community if release (**See** Exhibit A, p. 1, lines 12-13, 18-19; [**also see** In re Lee, (2006) 49 Cal.Rptr.3d at 936-37.]; **and (4)** the denial **was not** proper application of the California Penal Code § 3041 **et seq.,** and state regulations 15 CCR, § 2402 **et seq.**

The Due Process Clause of the Fourteenth Amendment prohibite state action that **deprives** a person of life, liberty, or property without due process of law. A person alleging a due process violation must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause, and then show the procedures that led to the deprivation were not constitutionally sufficient. **See** Kentucky Dep't of Corr. v. Thompson, (1989) 490 U.S. 454, 459-60; McQuillion v. Duncan, (9th Cir. 2003) 306 F.3d 895, 900. In the parole context, a prisoner alleging a due process claim must demonstrate the existence of protected **liberty interest** in parole, and the denial of one or more of the procedural protections that must be afforded when a prisoner has a **liberty interest** in parole. The U.S. Supreme Court held in 1979 and reiterated in 1987, that "a states scheme, if it sues mandatory languge creates a presumtion that parole release will be granted when or unless certain designated finding are made, and thereby gives rise to a constitutional **liberty interest**". McQuillion, 306 F.3d at 901, (**citing** Greenholtz v. Inmate of Nebraska Penal, (1979) 442 U.S. 1, 7; Board of Pardons

v. Allen, (1987) 842 U.S. 542 U.S. 369, 373). The Ninth Circuit Court of Appeal has held that California parole scheme creates a cognizable liberty interest in release on parole because Penal Code, § 3041 **uses** mandatory **language** and is similar to the Nebraska and Montana statutes addressed in Greenholtz and Allen, McQuillion, 306 F.3d at 901-02. As the Ninth Circuit has explained, "section 3041 of the California Penal Code creates in every inmate a cognizable **liberty interest** in a parole which is protected by the procedural safeguards of the Due Process Clause," and that interest arises "upon the incarceration of the inmate." (**See** Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 914-15; In re Rosenkrantz, (2002) 95 Cal.App.th 358, 372, In re Prewitt, (1972) 8 Cal.3d 470, 473-76; In re Thomas, (1984) 161 Cal.App.3d 721, 732; Sandors v. Conner, (1995) 515 U.S. 472; Baumann v. Arizona Dep't of Corr., (9th Cir. 1985) 754 F.2d 844; In re DeLuna, (2005) 126 Cal.Appth 585, 591; In re Lee, (2006) 49 Cal.Rptr.3d 931, 936, 939-40, Rosenkrantz v. Marshall, (2006) 444 F.Supp.2d 1063, 1080, 1081, 1086-87; Iron v. Warden of California, Solano, (2005) 358 F.Supp.2d 939, 947-78.)

The judiciary has an obligation to execute those laws. The record **establishes** that Petitioner **does not** pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support. As the record allow only one conclusion about Petitioner's lack of dangerousness to the public, it serves no purpose to remand this matter back to the Board to have them reconsider these decision. (**See** In re Scott, supra, 133 Cal.App.th at pp. 603-04 [ordering immediate release instead of remand where no evidence supported denyed parole]; cf. Rosenkrant v. Marshall, (2006) 444 F.Sup6p(r)p. 1087.)

**PRAYER FOR RELIEF.**

Petitioner is without remedy save for habeas corpus. According, Petitioner request that the court;

1. Issue a writ of habeas corpus;

2. Issue an order to show cause;

3. Order the Board to uphold Petitioner parole grant at August 5, 2004;

4. Delare the rights of the parties;

5. Order new hearing for Petitioner; **and**

6. Grant any and all other relief found necessary an appropriate.

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

Hayward v. Marshall (2008) WL 43715

Martin v, Marshall (2006) E.D.Cal. CIV-S-02-2664 MCN DAD-P.

In re Cooper. (2007).

Do you have an attorney for this petition? Yes____ No XX

If you do, give the name and address of your attorney:

Not Applicable.

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on 2/29/08
Date

[signature]
Signature of Petitioner

(Rev. 6/02)

EXHIBIT A

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**DEPUTY COMMISSIONER PEREZ:** **Okay, we**'re back on record.

**PRESIDING COMMISSIONER BRYSON:** All right. We've reconvened for the decision in the matter of Rugbir Singh and the time is 10:50. Sir, the Panel reviewed all information received from the public and from you and relied on the following circumstances in concluding that you are not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. This offense was carried out in an especially cruel and callous manner in that the victim, your wife, Aranda Singh, twenty-one year old female, was in her home with you planning a birthday party in the kitchen for your four year old son. Your son, Jason, who was in the living room, heard his parents arguing. The offense was carried out in a dispassionate and calculated manner. Your son Jason entered the kitchen and saw his mother trying to get away from his father, that was you. You grabbed her hair, pulled her down to the floor, then took a knife and slit her neck. Your son tried to help your - - his mother, but was ordered by you to go to a neighbors then to his uncle's home. The offense was carried out in a manner demonstrating exceptionally

callous disregard for human suffering. You stabbed your wife approximately twenty times. You don't have any prior record. You cited alcohol as a major part of the commitment offense. As to your institutional behavior, you have programmed in a limited manner, as to your prison work it has been unabated and apparently very successful. You have laudatory chronos in your file from 2004 and 2005 regarding your prison work in clothing. You have, according to our documentation, plateaued educationally. As to your vocations, you did complete the vocational tailoring. As to self-help and therapy, you have participated in self-help and therapy. Most recently you have been continuing to be involved in AA, which has been an ongoing participation over seventeen years for you. You did say you are not an alcoholic, and you were not able to cite any of the steps when asked about that here today. And after I provided one of the steps you, in fact, did not indicate that you had taken any action on that step in terms of internalizing it or following what it actually has taught. As to your misconduct while incarcerated, you're to be commended for having no 115s. That's very laudable. As to your 128a's, you have one, a minor – a 1999 counseling for returning late from the yard. So you have displayed positive behavior as regards violations while in prison. As to the psychological

report dated December 30 of 2002 by Dr. Sexton, S-E-X-T-O-N, Dr. Sexton's report assesses you with a low assessment of dangerousness and gives you a high global assessment of functioning of 85, which again, is a very high GAF. As to your parole plans, you have presented no viable residential plans in your last legal residence county, or for that matter, anywhere else in California, to this Panel today. You have represented verbally that your brother in Fresno would accept you but we have no documentation and basically if there is no documentation, as other Panels have explained to you, it really can't be verified. Although the Panels always want to believe you, we need the documentation to support the claim. As to your acceptable employment plans, we have received, again, no documentation of acceptable employment plans. You say that you have work lined up on the outside. You were unable to cite a company. You did give a company name, but basically we have no documentation. We also have no documentation of your transition plans back into the community as regards planning your continued participation in AA, NA or another self-help group, to help you adjust to living in the free society. As to Penal Code 3042 responses, the responses indicate opposition to finding of parole suitability, specifically by the District Attorney of Fresno County. In a separate decision, the hearing

Panel finds its not reasonable to expect that parole would be granted at a hearing during the following three years. Specific reasons for this finding are as follows: the offense was carried in an especially cruel and callous manner. The victim, your wife, Aranda Singh, a twenty-one year old female, was in your home with you planning a birthday party in the kitchen for your four year old son Jason, who was in the living room at the time and heard you arguing. The offense was carried out in a dispassionate and calculated manner, and your son entered the kitchen and saw his mother trying to get away from you. You grabbed her hair and pulled her down to the floor and then you took a knife and slit her neck. Your son tried to help his mother, but was ordered by you to go to a neighbors and then to his uncles home. The offense was carried out in a manner demonstrating exceptionally callous disregard for human suffering. You stabbed your wife approximately twenty times, murdering her, then you tried to enlist your brother-in-law's help to dispose of the body.

**INMATE SINGH:** They're lies.

**PRESIDING COMMISSIONER BRYSON:** And Jan Jon Bahadurand (phonetic) told you to turn yourself into police, which you did. You had a clear opportunity to cease during this crime, but you continued. The motive for this crime was very trivial in relation to the

offense. It was basically jealousy. To say this is an extremely grave crime, and this Panel believes that you fail to understand the nature and magnitude of this vicious murder. Today, as you have in the past, you blame the crime on your wife's adultery and alcohol and you said, and I quote, to this Panel, I quote: "I have forgiven myself for all the things I have done". Your testimony today is that you are not an alcoholic. You have participated in alcohol - in AA, for over 17 years. Today you were asked to recount one step and you were not able to do that. You also told this Panel that prison is where you learned to correct your mistakes. Sir, this crime was not exactly a mistake. In fact, you were told this by the prior Panel last year. This is a very grave crime and you blame everyone else and fail to take responsibility for it yourself. We're denying you parole for three years, we're placing you on the 2009 calendar for your next subsequent hearing. If this decision is final, you will not get paroled. The Board will send you a copy of the decision, it will indicate the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can read the laws about your hearing at California Code of Regulations, Title XV, Section 2041. The Board recommends: get self-help. Sir, the Panel represents

that this is more than just going to AA classes and sitting through them. You definitely need self-help because you need to gain some insight into your crime. Another recommendation is to stay discipline free, which you have done. And to earn positive chronos. And also, we are requesting a new psychological evaluation, or BPT Form 1000A, to be completed prior to your next hearing. Commissioner, do you have anything to add?

**DEPUTY COMMISSIONER PEREZ:** No, I think we've covered everything.

**PRESIDING COMMISSIONER BRYSON:** Thank you, sir. I wish you good luck. And that concludes this hearing. The time is now 10:58.

**INMATE SINGH:** Can I say something?

**PRESIDING COMMISSIONER BRYSON:** No sir. This hearing is (inaudible).

**A D J O U R N M E N T**

--oOo--

**PAROLE DENIED THREE YEARS**

**THIS DECISION WILL BE FINAL ON:** DEC 27 2006

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, TENA OLVERA, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 57, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RUGBIR SINGH, CDC No. D54338, on August 29, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated: November 15, 2006 at Sacramento County, California.

Tena Olvera

_______________________________

Tena Olvera

Transcriber

**Northern California Court Reporters**

EXHIBIT B

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**DEPUTY COMMISSIONER MEJIA:** We're back on record for our decision.

**PRESIDING COMMISSIONER WELCH:** Okay. Mr. Singh, we have a decision. Everyone that was here before have returned. The Panel reviewed all the information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to the public if released from prison. Here's the rationale for our decision. One, the prisoner has no record other than the instant offense. And after reviewing the rap sheet, he appears to have no criminality either as a juvenile or adult offense. Can't speak for Fiji, but certainly in the United States and in particular in California, there was no other criminality noted. We do say that the prisoner had a stable social history in part. When we say that, we need to qualify what we mean by stable social history. We're specifically talking about his relationship with his family, because it appears that -- we know that, one, from the record, that the prisoner is an immigrant from Fiji. It appears that he sponsored

his family members and brought them to this country. It appears that he supported them once he got to the country until they were able to get on their feet. So when we say you had a stable social history, we're referring to that facet of his social history. Certainly we're not talking about he social history as it relates to his two failed marriages, because those was disastrous. However, from a prospective of his family, meaning his mother, father, and his brothers and sisters that he sponsored once he got to -- once they came to the country. It also appears to the Board that he have a real strong network with his relatives. And it appears that they will support him once he comes out of prison in terms of a place to live, in terms of financial support. And that's another reason we made the decision. We realize that the prisoner does not have parole plans in Fresno as amply pointed out by the District Attorney. His only job offer is in Sacramento. But we took that into consideration, and we took in consideration this report that was -- the petition that was submitted, and what appears to be a very strong family network waiting to support the prisoner once he gets out. The other thing that we took in consideration under this social history is age. We looked at the

psychological evaluation. I'll talk about that a little bit later on. But the last psychological report by Dr. Zika --

**DEPUTY COMMISSIONER MEJIA:** Sexton.

**PRESIDING COMMISSIONER WELCH:** By Dr. Sexton, he note that the inmate have severe medical problems including severe psoriasis, hypertension, headaches, heart trouble, and currently being treated for all of these above. The prisoner also have cataracts on both eyes, but had lens replacement surgery on his eyes in 1985, and then again, on the other eye in 1987. He reported his vision still remains somewhat poor. Inmate Singh indicates his only history of serious accident would indicate that when he was kicked in the head, and I guess by a horse at the age of five. And he have long-term damage from that injury. And I'm going to talk about that a little bit later on. But there's another reason in terms of stable social support, I guess is probably a better way to put it. It appears that the prisoner is 63, and that he's going to need a strong network of support in terms of his medical conditions. And it appears that probably at this point in his life it's probably better for the prisoner to receive a date so that he can receive some of that care and

support by his family before he reach the point that the state will end up having to really fork out a lot of money in terms of his ongoing care. So it appears that he have a network of family support that would be able to support him in that. That's another reason for our decision. Now while in prison we said the prisoner hasn't attempted to enhance his ability to function within society upon release through -- One, through education. We note that the prisoner made several valiant attempts to improve his education, but there is documentation in the C-File that notes that the prisoner reached a plateau and he just can't go any further. And that has a lot to do with his educational -- I mean with his injury that I noted earlier with the psychological -- I mean from the incident that happened when he was younger. Then I get to substance abuse. My colleague questioned the prisoner regarding his -- the knowledge of the steps, and we took that in -- from AA which you've attended for eight years. There's documentation in the file that indicate -- Well, maybe he can't remember the steps. But what impressed us is that he persevered even with his lack of ability to comprehend and stayed in the program for 18 years. And it appears that he have an overall concept of

what -- substance abuse and how it can effect you. So we're talking about self-help there. So certainly we took that into consideration. The other thing we looked at is the other kinds of self-help that he participated in. He participated in VORG, efficiency -- He got an efficiency award for participating in a self-help program that dealt with several issues, Men's Violence Prevention. Breaking Barriers he participated in, chemical dependency he participated in. There's also the Path to Peace and ongoing participation in AA as I previously noted. So we took all that into consideration. Vocation, we noted that the prisoner have not achieved a vocation. And as I previously stated we know that he have to achieve at least a minimal score on his -- on the TABE test in order to ascertain a GPL so that he can be placed in a vocational program. We noted that he reached a plateau, and he was not able to participate in those programs. However, we looked at his institutional assignments. The jobs that the prisoner qualified for, he receives outstanding work reports. And we felt that was impressive. He used what he had to do, you know, what he could do. As I previously noted, there was not a significant criminal history. Because of maturation and

growth, understanding, and advanced age, we feel that that has reduced the probability of recidivism. And we based that not on his psychological evaluations, the accumulative evaluations. And I'll get to those in a minute. However, we did look at the psychological -- We did look at the correctional counselor's report, which notes that the prisoner if released would probably pose a moderate degree of threat to the public if released from prison. That was his assessment of dangerousness. But then, however, he goes on to say,

> "Based on the prisoner's disciplinary-free history since his incarceration while in a controlled setting, his supervisor work reports are above average, and his past history of participating in AA and substance abuse group."

But then he says he has not upgraded educationally as recommended by the Board of Prison Term. However, we would have thought that the correctional counselor would have reviewed the C-File and noted that the prisoner had repeatedly attempted to upgrade educationally. However, they said your file clearly demonstrates that the

prisoner is not capable of doing that. So that's why we did not put as much faith in the correctional counselor's assessment. Another area that we feel that the correctional counselor fell short on his assessment is he writes, "The prisoner declined to review his C-File to prepare for his upcoming Board of Prison Term hearing." There again, if the correctional counselor would have reviewed the record, he would understand that the prisoner may have had some concerns, some ADA issues in terms of his ability to read, comprehend, and understand the C-File, the documents. And further, if he reviewed further recommendations from the Board of Prison Terms, he would have noted that --

[Thereupon, the tape was changed.]

**DEPUTY COMMISSIONER MEJIA:** -- (inaudible) the reading of the decision.

**PRESIDING COMMISSIONER WELCH:** Okay. The Board at one point did recommend that a psychological evaluation be conducted with an interpreter to ensure that the prisoner understood. We've already talked about the prisoner's parole plan and his family support. And we feel that he have maintained close family ties. He have recently maintained positive institutional

behavior. We reviewed the file in its entirety. There's no disciplinary. There's no serious 115s in the file. However, we do note that there was one minor 128 write-up in the file for late return from the yard. We reviewed that, and we did not find that it's significant in terms of a behavior problem while in prison. So certainly we feel that his positive institutional behavior indicates that he's able to maintain self-control. The prisoner does show signs of remorse. However, the prisoner did not talk about the crime. However, we were able to review the psychological evaluation and correctional counselor report, the prisoner's versions. There were some concerns about the prisoner in terms of how many times he stabbed the victim. In his report, he talked about nine instead of 19 times. However, in reviewing the psychological evaluation I think the doctor gave a pretty good explanation in terms of the prisoner's remorse. And I guess that's what the Board was really looking for is whether or not he's remorseful for it. And the doctor when he talks about whether or not the prisoner -- the reasons that the prisoner may have a difference in review -- a different opinion of what happened and what the official records document. But I think the

most important thing here is that the prisoner shows signs of remorse. And I think that demonstrates some growth and maturity, and that he understands the nature and the magnitude of the offense and accepts responsibility for his criminality and have a desire to change towards good citizenship. Psychological evaluation -- Now I'll go through the psychological evaluation. I've already talked a little bit about it. But another -- Dr. Sexton talks about his parole plans. One of the things that Dr. Sexton indicated under parole plans is that Inmate Singh indicates that when he paroles he hopes to return to Fiji where his family owns a house. He indicates that he would live with his family. He says,

> "Inmate Singh has concrete plans, both for employment and his living situation once on parole. These plans appear to be completely viable and shows judgment on his part. As a result (indiscernible) for adjustment to the community would be reviewed as very likely to be positive."

We've talked a little bit about that. Today the prisoner did submit plans to go back to Fresno and to live with his family, that part of the family

that he sponsored when he came over. So I think that what he presented today and his attorney presented seem like a viable plan. So we didn't put a lot of store in that portion of the report. Current diagnoses, he writes,

> "Inmate Singh's future prognosis is very good. There is absolutely no indication that his mental health status will deteriorate in the community based on the information from the Central File and Inmate Singh's statement. It appears likely that alcohol abuse will play a significant role in the remainder of his life."

And the prisoner appears to recognize that, and today he talked about getting involved in substance abuse programs in the community. The doctor goes on to talk about, "If released to the community, his violence potential is estimated to be no more than the average citizen in the community." And he based his opinion on an array of different reasons. In conclusion, Dr. Sexton writes,

> "I am in agreement with previous clinicians who have completed Board of Prison Terms Reports that Inmate

Singh is unlikely to commit future violent acts either in custody or in the community."

And I think that's what's important, whether or not there's a threat. And if we go back to the last full evaluation was on 1/27/2000, and I think that was by Dr. Terrini, he says, "If released to the community, his violence potential is clearly estimated to be no more than the average citizen in the community." So it appears that from a psychological prospective from the best prognosis we can get that the prisoner does not present a major problem. So we go to the base term of commitment -- of confinement I should say. The base life offense for which the prisoner has been convicted is murder second, 187. The offense occurred on June 28, 1986. The term is derived from the matrix located in CCR Title 15 at 2403(c). That's for second-degree murder. Offense was committed on or after 11/08/1978. The Panel finds that Category C-II is appropriate in that one, the reason we went with the higher matrix is because death resulted from severe trauma inflicted with deadly intensity, and we do accept the Fresno County's assessment of what happened, 19 stab wounds. Certainly that's with deadly intensity.

So we gave him the highest matrix of severe trauma. We also note that the prisoner had a prior relationship. That's why we used II, Counselor. It was his wife, his spouse. We aggravated this offense. And the reason we aggravated this offense is for several reasons. One, we feel that the victim was vulnerable. The prisoner picked her up. She had every reason to -- and took her to the house. She had every reason to believe that this would not occur. During the commission of the offense, the prisoner had an opportunity to cease, but instead continued. We say that because the child, the four-year-old that came in the room and the prisoner sent him away to the neighbor. So we thought that was particularly vicious. So we aggravated it for that. The prisoner had a special relationship of confidence and trust. It was his wife. And certainly that was a vicious way to kill someone that allegedly you cared for, you loved. The manner in which you carried out the offense created a potential for injury to others. Now we say that because there was a child involved, a four-year-old. You sent a four year old out of the house while you're killing your wife. You sent him over to the neighbor's house. And God only knows why the neighbor sent him to another -- to your

brother-in-law's house. But there was a child. So it created a potential for harm to the child. You showed not only for your wife when you killed her, but you didn't show any respect for your child or concern. So we aggravated it to the highest that we could actually. Now we go to the base term of the offense, which is 228 months. There was no other life terms. There was no other non-life terms. He had no other prior criminal history, no prior felonies. He had no serious disciplinaries. The court took into consideration the weapon that was used, and that was all part of the offense. And we did not aggravate for the weapon or anything like that. So you have a total of 228 months. Post-conviction credits we gave you from 4/22/1987 to 8/05/04, which was 68 months. We didn't give you any fractions. There was a four months difference. We didn't give you a fraction of that. We figured 68 is all the Board feel that is appropriate at this time. So what we did is we subtracted 68 from 228. That leaves 160 months to serve. Now we are making a special condition of parole. Do not use alcoholic beverages. Don't even go near alcoholic beverages. That is a special condition of parole. Submit to alcohol testing as required by your parole officer. We

also make a special condition since you've been in prison for a long time to attend outpatient clinic as directed by your parole officer. And also since you told the Board in your testimony today, you testified that you were going to involve yourself in a substance abuse program, we're going to hold you to it. We're going to make that a special condition also. Based on your testimony today, that once you receive a parole date that you would involve yourself in a substance abuse program and make that a part of your parole plans. And we will hold you to that. So we'll make that a part -- There again, we looked at whether or not you had a job. So you're 63 years old. So it appears, based on your testimony -- And all this will be researched, that you supported and you sponsored your family. And it appears that your family is willing to support and sponsor you. So normally the Board -- the Panel will not give a date without some physical means of support in terms of a job. So you got -- it appears to be a place to live. But it appears that there's a reciprocation there, where they want to reciprocate for you. However, I need to tell you that all this is going to be investigated by our investigators. And if what you said is not true, we will know that, because your

parole plans will be thoroughly investigated. Okay. Commissioner, do you have any comments?

**DEPUTY COMMISSIONER MEJIA:** Keep up your progress and I wish you all the luck in the world. And hopefully you'll be reintegrated back there without any problems.

**INMATE SINGH:** Thank you.

**PRESIDING COMMISSIONER WELCH:** All right. That concludes this hearing at 11 o'clock.

**ATTORNEY SILVER:** Thank you very much, Commissioners.

--oOo--

PENDING REVIEW AND APPROVAL

PAROLE GRANTED

THIS DECISION WILL BE FINAL ON:____________________.

YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 89, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RAGHBIR SINGH, CDC No. D-54338, on AUGUST 5, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 23, 2004, at Sacramento County, California.

April Allen<br>
Transcriber<br>
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT C

Sent to Inmate on 7-7-06

# LIFE PRISONER EVALUATION REPORT
# SUBSEQUENT PAROLE CONSIDERATION HEARING
# AUGUST 2006 CALENDAR

**SINGH, RIGBIR** **D54338**

**I. COMMITMENT FACTORS:**

A. **Life Crime:** Murder 2nd (PC 187), Fresno County Case #354671-0. Sentenced: 15 years to Life. Weapon: Knife. MEPD: 4/28/96. Received in CDC: 4/22/87. Victim: Aradhna Singh, age 21.

1. **Summary of Crime:** On June 28, 1986, Inmate Singh and the victim were planning a birthday party in the kitchen for their (4) four year old son, which was to take place the following weekend. They began arguing over her infidelity and a broken lunch engagement. The victim's son, Jason Singh, age (4) four was sitting in the living room where he heard his mother and father arguing. He heard his father call his mother a "hooker" and other nasty names. He entered the kitchen where he saw his mother trying to get away from his father. His father grabbed her hair, pulled her down to the floor, then took the knife and slit his mother's neck. The son tried to help his mother, but was ordered by his father to go to the neighbor's home. The son went to the neighbor who sent him to his uncle, Jan Jange Bahadurand's home. The son informed him of the argument between his mother and father and that he thought his mother might be dead. Singh stabbed his wife approximately 19 times. He subsequently left his home, drove his car to his brother-in-law's, Jan Jange Bahadurand's, home at 4525 Hoxie Street. He told him that he and his wife had a dispute. His brother-in-law asked him if he had killed his wife while noticing the blood on his chest. Singh replied, "No".

Inmate Copy

Mr. Bahadurand told Singh that he must be lying. Singh then admitted that he might have murdered his wife and that he needed his help. He wanted to bag her up and dump her somewhere.

Mr. Bahadurand told him that he would rather not get involved and that he had better take himself to the police station. Singh asked if his son had been there. Then he stated that he was going to the police station. Singh arrived at the Fresno Police Station at 2:30 P.M., told the police officer that he wanted to turn himself in because he might have killed his wife. At approximately 2:45 P.M., a police officer responded to a call from the Singh's neighbor, Larry Williams. Mr. Williams stated to the officer that

the victim's son had come by his home and said that his father had cut his mother's throat and she was bleeding badly. Mr. Williams then sent the boy to his relatives' home, Mr. Bahadurand. Mr. Williams had his wife call the Singh's residence, but there was no response. Mr. Williams observed Singh getting into his car and backing out of the driveway. Singh then stopped in front of Mr. Williams' home and asked if his son had been there. Mr. Williams told Singh that his son had gone to his relatives' home on Hoxie Street. Later, Mr. Williams drove to the Hoxie residence and inquired if Singh had been there. He was told that Singh had killed his wife and gone to the police station to turn himself in.

While he was gone, his wife, Mrs. Williams, went over to the Singh home and knocked on the doors and windows but there was no response. She then went back to her home. Mr. Williams had just returned when she called the police. At 2:55 P.M., the police arrived and found the victim in the kitchen lying face up in a pool of blood.

2.    **Prisoner's Version:** "I was ready to pick up my wife from work, then thought secondly against it because I was intoxicated. So, I called my brother-in-law to go pick her up for me. He told me, "No, you go pick her up. I got a lot of work to do." Then he told me to drive carefully.

"Me and my wife began our stormy relationship after she started working at Champion Auto Parts. She started drinking alcohol, using cocaine and marijuana. Things really went awry when she started sleeping with other men. She eventually moved out of the house and started living with her boyfriend. After her boyfriend left her, she asked me if she could move back in to our home."

"Sometime thereafter, an arrangement was made to have lunch with her at her place of employment. I went and purchased some fried chicken, and arrived at her job, but was told that she had already gone to lunch. I became disappointed about my wife's infidelity, I left, and began to drink heavily to a point that I was even more intoxicated. After she had finished work, I drove to Champion Auto Parts, and picked her up and I told her: "If you're gonna have an early lunch then you should have called me; I could have finished my work". While I was driving to our home she began arguing with me, then hit me with her purse. At that time I realized that she was high on drugs. Our son was seated in between us. She continued reaching across our son hitting me with her purse. I then told her to "quit it, you're gonna make us have an accident." She ignored me and continued hitting me with her purse. So, to get her attention, I slapped her with the back of my right hand. She was injured with a small cut on her left eyebrow from the ring on my finger. She was bleeding and some

of the blood got on our son's shirt. That's how the blood got on our son's shirt".

"When we arrived home, as soon as I parked the car in the driveway, she was very angry and stated that she was going to kill me. Then she went inside of the house and slammed the door. I knew that there were going to be problems. So, I told my son to go to his aunt's house and tell her that your mom is fighting with your dad. My son never went inside of our house when the trouble started."

"When I came inside the house she began arguing with me stating: "Yeah!, I went to lunch with my boyfriend so what." She picked up a big glass of water and threw it at my head, I ducked and the glass hit the sink and broke into pieces. These statements are in my Court Transcript. She then, got a kitchen knife, so I went outside and she followed me there too. I tried to pull the knife from her hand, and that's why she got a little cut from her hand. Then, she kneed me in my testicles. We both fell down to the floor and I hit my head real hard and blacked out. That's why I couldn't remember stabbing her. Then the next thing I knew I was outside in my car. I drove to my sister's house."

"My brother in law was outside mowing the grass. I told my brother in law that I had a fight with my wife and I want to report it to the police, can he drive me; because, I'm too drunk to drive. He refused saying "no!" you go I have a lot of work to do. So I drove myself to downtown instead of the police station I ended up at the wrong place."

"I went inside the little office and told the lady there at the counter that I had a fight with my wife and I want to report it. She said that you're at the wrong place. So, she called the police on the phone and explained it to them. The police came over there and handcuffed me. He never read me my Miranda Rights. The Court Transcript stated that she was stabbed nine times; however, a clerical error in the Correctional Counselor's Board Report states that it was 19 times. This is a false statement. I never asked my brother in law to help me to put the body in the bag and destroy it. That also is a false statement."

"In addition, I speak a foreign language and was not provided an interpreter during none of the criminal proceedings. Everything was spoken in English and I couldn't understand English.

This is the whole truth nothing but the truth so help me God. Help me America to receive justice."

Thank you for your time and cooperation.

P.S. I have (125) pages of Court Transcript, if you picked the truth from the (125) pages only (5) pages is mine; a (120) pages is false statements and has nothing to do with my case.

3. **Aggravating/Mitigating Circumstances:**

a. **Aggravating Factors:**

1. Victim was particularly vulnerable.
2. Prisoner had opportunity to cease but continued with crime.
3. Use of Weapon: Knife.
4. Nature of crime exhibited viciousness, cruelty or callousness.

b. **Mitigating Factors:**

1. Prisoner has minimal or no history of criminal behavior.

B. **Multiple Crime(s):** N/A.

1. **Summary of Crime:** N/A.

2. **Prisoner's Version:** N/A.

## II. PRECONVICTION FACTORS:

A. **Juvenile Record:** None.

B. **Adult Convictions and Arrests:** Instant Offense.

C. **Personal Factors:** Singh is a Sheik Indian. He is the eldest of two sons and two daughters. He was born December 1, 1940 to Lavhnranpari Singh in the Fiji Islands. His father passed away from natural death in 1960. The family then moved in with relatives after his father's death and life became very difficult.

He worked those years making bricks, cutting sugar cane, doing construction work or whatever else he could find in order to help feed his family. Knowing that he was the eldest son, he assumed the place of his father. He eventually found work, for a time, with the World New Zealand Air Force as a maintenance man. He then found employment in New Zealand at the age of 23 on a ranch as a tree cutter, attending school for only three of those years.

In 1967 he married Josoda Singh, a woman that was 10 years his senior. They moved to the United States in 1968 and settled in the San Francisco area. He

worked for a short time as a warehouseman at the California Garment Factory in San Francisco, then as a janitor at Sears and finally at PG&E in San Bruno. During this time, he was able to bring his mother, his sister, and brother to the United States. To support them, he moved them to Fresno and started a janitorial business. His wife soon discovered that she did not like the Fresno area so she went back to San Francisco. He followed her a year later, but the relationship soured. In 1978 they divorced, she moved back to the Fiji Islands and he moved back to Fresno. They had no children.

The second marriage was to the victim, she was 22 years old. A mutual friend from San Francisco arranged for a younger sister to come to the Fresno Area and for Singh to meet her at the bus. She had no place to go, so she went home with him. Shortly thereafter, she became pregnant. They had their son in June of 1982. At first Singh refused to marry her because she was much younger, did not share the same religion, and he was to have married his wife's older sister. They married one year later after their son was born in a Sheik Temple. However, the marriage was never certified.

## III. POSTCONVICTION FACTORS:

A. **Special Programming/Accommodations:** N/A.

B. **Custody History:** All documents from the previous hearing remain the same. Since Singh's last Board Report he has been assigned to the Clothing Room. Singh was received at CTF on 3/11/99 and has remained at CTF in the general population with Medium A Custody. (See Post Conviction Progress Report).

C. **Therapy and Self-Help Activities:** Since Singh's last BPH Hearing he has participated in Alcoholics Anonymous. (See Post Conviction Progress Report).

D. **Disciplinary History:** Since Singh's last BPH Hearing he has remained disciplinary free.

E. **Other:** Singh attended his Subsequent #5 Parole Consideration Hearing on 8/31/05. Parole was denied for 1 year. The Board recommended that Singh remain disciplinary free; earn positive chronos; and no 115's and 128A's.

## IV. FUTURE PLANS:

A. **Residence:** Singh plans to reside with his sister, Ramrigie Bahalor, at 4528 E. Hoxie Avenue, Fresno, California. Her telephone number is (559) 485-3549. The county of his last residence is Fresno. Upon discharge from parole, he plans to return to the Fiji Islands.

**B.** **Employment:** Due to his age, Singh claims his brother, sister, and son have offered to support him. He did not offer any letters of reference for employment at the present time.

**C.** **Assessment:** In review of Singh's parole plans, this counselor does not foresee any problems, however, it is recommended that Singh update his support letters prior to his hearing.

**V. USINS STATUS:** N/A.

**VI. SUMMARY:**

**A.** Prior to release the prisoner could benefit from:

1. Continuing to be disciplinary free.
2. Participation in self-help and therapy programs.

**B.** This report is based upon an interview with the prisoner on 4/26/06 lasting approximately 1 hour(s) and a complete review of the Central File lasting 2 hour(s).

**C.** Per the Olson Decision, Singh's was afforded an opportunity to review his Central File. On 4/26/06 Singh did not examine his Central File. (Refer to CDC 128-B dated 4/26/06 in the General Chrono Section of the Central File.)

**D.** No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
AUGUST 2006 CALENDAR
7

6-30-06

T. Verdesoto Date
Correctional Counselor I

CCII 6-30-06

D. Carnazzo Date
Correctional Counselor II

FC (A) 6-30-06

I. Guerra Date
Facility Captain

C&PR 6-30-06

D. S. Levorse Date
Classification and Parole Representative

SINGH, RIGBIR D54338 CTF-SOLEDAD AUG/2006

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 4/05 to 4/06 | | | **PLACEMENT**: Remained at CTF in the general population.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**: None this period.<br>**ACADEMICS:** None this period.<br>**WORK RECORD**: Singh continued his assignment in the clothing room with no current CDC 101's. There is a laudatory chrono dated 8/25/05 from his supervisor commending him on his outstanding work ethics.<br>**GROUP ACTIVITIES**: Singh participated in Alcoholics Anonymous as verified by CDC 128B's dated 4/1/05, 6/30/05, 10/6/05, and 12/27/05.<br>**PSYCH. TREATMENT**: None noted during this period.<br>**PRISON BEHAVIOR**: Singh remained disciplinary free during this period.<br>**OTHER**: N/A. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | DATE |
|---|---|
| J Verdesoto [signature] | 6-21-06 |

SINGH D54338 CTF-SOLEDAD AUG/2006

BPT 1004 (REV 7/86)

EXHIBIT D

paroled today or get a parole date today. In addition, we don't have any support as far as his living arrangements. And I don't doubt that he can live with a relative, but we do not have those supporting documentations that would suggest that is in fact the case.

**INMATE SINGH:** I will - -

**PRESIDING COMMISSIONER BRYSON:** Do not interrupt.

**DEPUTY DISTRICT ATTORNEY SANDERSON:** You'll have a chance. So, for the reasons stated in the Governor's letter and from what I've heard today, he does tend to blame his actions on a number of different things, one of which is this alcohol and I don't think he's fully addressed, or come to grips, that is he lacks insight into his actions and why they occurred at the time of the commission of the commitment offense. The people are still opposed to any parole date at this time. I'll submit it on that.

**PRESIDING COMMISSIONER BRYSON:** Thank you. And now counsel, I'd like to give you the opportunity to make a closing statement.

**INMATE'S ATTORNEY:** Mr. Singh wants to be found suitable for parole today and that he believes he no longer poses an unreasonable risk of danger to the community. He's been a good worker in the instutition and the Panel that gave him a release date believed that

was a factor in showing that he's growing and matured with a decreased probability of recidivism. And that he shows signs of remorse, considering today he spontaneously when described the impact of the crime on his son, he did cry during that portion of the hearing, that would be an indication of remorse. That he participated in self-help and has been involved in various groups over the course of his incarceration shows that he has been willing to program according to the way the Panel have looked at him. That he's been involved in AA, although at the same time (inaudible) his ability to (inaudible) he doesn't seem to recall steps. However, he realizes that he can't drink again and return to the community and is willing to participate in a group setting knowing that there is a group available in Fresno. I think that is recognition of the relationship of alcohol use and his crime and his understanding that abstinence would be important to the probability of recidivistic behavior, so I think he gets it. Although I don't think he's the most articulate inmate, he understands the stress of her behavior and his repeated (inaudible) described his situation, that doesn't mitigate his conduct and that he accepted the plea that he intentionally took her life based upon numerous wounds on her body. He took responsibility for that by admission, which is the element (inaudible). He has places to live, a place to live with his brother I

could easily confirm, as well as he has the capacity for employment with prior skills of janitorial and some sewing operator skills. The last Panel that gave him a release date thought that he was on the most aggravated part of the matrix and even went back to legislative guidelines (inaudible) six years over that time so I think that he has been punished sufficiently for the nature of his crime. He's reached his educational plateau, although I don't think that would be a reason to set him free. He (inaudible) a few more in this area. (Inaudible).

**PRESIDING COMMISSIONER BRYSON:** Thank you. And now sir, I'd like to give opportunity to address this Panel regarding your suitability for parole today.

**INMATE SINGH:** I'm 66 years old ma'am. My time is over, I got one foot outside the grave, one inside the grave, you know. I think I'd rather die home and free then die here. That's what I am confessing. Nothing else to say.

**PRESIDING COMMISSIONER BRYSON:** All right, thank you sir. We'll now recess for deliberations. The time is 10:25.

**R E C E S S**

--o0o--

# EXHIBIT E

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
APRIL 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 30, 2002

This is the fifth psychological evaluation for the Board of Prison Terms on inmate Rigbir Singh, CDC# D-54338. This report is the product of a personal interview, lasting approximately 90 minutes, conducted on 12/30/02, as well as a review of his Central file and unit health record. This single contact interview was for the express purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

### I. IDENTIFYING INFORMATION:

Inmate Singh is a 62-year-old, widowed male from the islands of Fiji. His date of birth is 12/01/40. His stated religious preference is Sikh. There were no unusual physical characteristics noted, other than a small scar below the left eye. He reports that the injury resulted from being kicked in the head by a horse in 1945. Inmate Singh indicates that he has a nickname of "Baba".

### II. DEVELOPMENTAL HISTORY:

Inmate Singh indicated that he was born and raised in the island nation of Fiji. He indicated as a boy he spoke both Hindi and English. He indicated that his English was not that good, and has subsequently taken English classes to increase his verbal skills. He denied any history of birth defects or abnormalities of developmental milestones. He denied a history of cruelty to animals, a history of arson, or a childhood history of physical or sexual abuse as either a perpetrator or a victim.

At the age of five, inmate Singh was kicked in the head by a horse, and was taken to the hospital. He indicated that he was in a coma for approximately two days, and that the attending physician told his parents

that it could be a fatal injury. Scarring below his left eye is all that visually remains of the incident. There is no indication, either reported or behaviorally observed, that suggests that he suffers from a neurological impairment as a result of this accident.

## III. EDUCATIONAL HISTORY:

Inmate Singh indicates that he completed two years of formal education in Fiji. Inmate Singh and the Central file indicate he spent approximately seven years in school while incarcerated in CDC.

An educational chrono in 1995 indicates that, due to impaired eyesight and lack of improvement, he was reassigned to vocational work rather than education. At that time, his educational scores were: reading 2.6; mathematics 3.7; language 3.4; with a total given of 3.2. His spelling total was 3.4.

Inmate Singh reports attending no further educational programs in CDC. He did not complete a GED.

## IV. FAMILY HISTORY:

Inmate Singh reports that his mother is still alive at age 83. His father is deceased. Inmate Singh indicated that his family visits him approximately two to three times a year, although it has become increasingly difficult because of changing medical conditions of his family. He indicated that they "take good care of me," sending money regularly, and staying in telephonic communication. Inmate Singh indicated that he gets along well with his extended family, and sees no problems upon parole. Inmate Singh indicated that he is the only person in his family who has been convicted of a crime, and that everyone in his family, including his far-extended family, have remained crime free, and alcohol and substance abuse free.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Singh stated that he is a heterosexual male. He denied any history of high-risk sexual behavior or sexual aggression.

## VI. MARITAL HISTORY:

Inmate Singh has been married twice. His first marriage lasted 15 years, and ended in divorce. Inmate Singh indicated that his first marriage ended amicably, and that there was no history of physical abuse during or after that marriage. He indicated that there was never an occurrence that the police were called by either he or his first wife. Inmate Singh indicated that he believes that his first wife has returned to live in Fiji.

## VII. MILITARY HISTORY:

Inmate Singh denied any military history.

## VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Singh was proud of the fact that, prior to his incarceration, he was employed by Sears, Roebuck and Company. He was equally proud of the fact that he was employed by Pacific Gas and Electric as a janitor. Inmate Singh indicated that he also had his own business, Midland Building Maintenance (MBM), a janitorial service. Inmate Singh indicated that "I was doing very well." He indicated that family members would often help him with his janitorial business. Inmate Singh stated that, when he paroles, he expects to return to the janitorial services industry. He indicated that he still has all of his equipment at his sister's residence. He stated, "All I need is a business license, and I can start……oh, and insurance."

Inmate Singh has numerous laudatory chronos related to his various positions of employment at CDC. He is currently working in the garment industries, providing clothing to new arrival inmates.

## IX. SUBSTANCE ABUSE HISTORY:

Inmate Singh was very open and matter-of-fact in his statements of his substance abuse and alcohol abuse history. Inmate Singh indicated that, while a resident of Fiji, he consumed Kava, a mild sedative that is consumed completely legally throughout much of the South Pacific. He stated that he was surprised to see

it for sale here in the United States, but that he has not consumed it since moving to the U.S.

Inmate Singh stated that he is not an alcoholic, and does not believe that he had prior problems with alcohol consumption. Inmate Singh indicated that, on the date of the instant offense, he began consuming scotch whiskey at approximately 10:00 a.m., and continued drinking until approximately 2:30 p.m. He indicates that he drank approximately one and a half, 750 milliliter bottles of scotch whiskey. He indicated that the whiskey had been purchased for an upcoming party, but that he began consuming it in the morning. He said, "I hurt inside. I just started drinking."

Inmate Singh indicates that, at the time of the offense, he was significantly intoxicated, and is somewhat upset that this fact was not brought to the attention of the Court. He continued to complain about his trial council, saying, "At trial, I told the female attorney I was drunk, but she didn't use it. I should have been here only five or six years. That was my only evidence." After much effort on my part, no blood alcohol level could be located in the file, nor statements about the level of intoxication in the probation report that would substantiate his statements.

Inmate Singh continues to attend Alcoholics Anonymous programs in CDC, and has been an active member for approximately 15 years. He has many laudatory chronos documenting his active participation. Inmate Singh stated, "I will never drink again. It is poison to me. It will never be in my house again."

**X. <u>PSYCHIATRIC AND MEDICAL HISTORY</u>:**

Inmate Singh has several medical problems, including severe psoriasis, hypertension, headaches, and heart trouble. He is currently being treated for all of the above. Inmate Singh also had cataracts of both eyes, but had lens replacement surgery on one eye in 1995, and then again on the other eye in 1997. He reports his vision still remains somewhat poor. Inmate Singh indicated his only history of a serious accident was the incident when he was kicked in the head by a horse

at the age of five. There is no evidence indicating that he suffered long-term damage as a result of those injuries. He denied a history of suicidal or homicidal ideation. He denied a history of seizures or any other neurological conditions. There was nothing in his presentation that suggested that he suffered from a neurological or psychiatric condition.

XI. **PLANS IF GRANTED RELEASE:**

Inmate Singh indicated that, when he paroles, he hopes to return to Fiji, where his family owns a house. He indicated that he would live with family. Inmate Singh has concrete plans for both his employment and his living situation once he is paroled. These plans appear completely viable, and show good judgment on his part. As a result, his prognosis for readjustment to the community would be viewed as very likely to be positive.

## CLINICAL ASSESSMENT

XII. **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Singh is smallish in stature, and his physical characteristics indicate his East Indian heritage. He appears his stated age of 62. He was well groomed, and appropriately attired in standard CDC issue. He was cooperative, straightforward, and eagerly voiced his own opinion. His speech was completely coherent. He was calm, alert, and appropriate in all spheres. His flow of thought and affect were within normal range. He spoke with a distinct accent, but his English was more than sufficient for the instant evaluation. He tended to be somewhat overelaborative, wanting to explain responses in more detail than was necessary. However, it was not indicative of any mental disorder or personality disorder. His intellectual functioning appeared to be in the normal range. His judgment appeared to be sound. However, he frequently minimized his own responsibilities. There was absolutely nothing in his presentation that suggested that he suffered from a major mental illness.

**CURRENT DIAGNOSTIC IMPRESSIONS:**

**AXIS I:** No Contributory Clinical Disorder.
**AXIS II:** Alcohol Abuse, by history, currently in institutional remission.
**AXIS V:** GAF (Global Assessment of Function) = 85.

Inmate Singh's future prognosis is very good. There is absolutely no indication that his mental state will deteriorate in the community. Based on the information from the Central file, and inmate Singh's statements, it appears unlikely that alcohol abuse will play a significant role in the remainder of his life.

**XIII. REVIEW OF LIFE CRIME:**

When inmate Singh was asked to describe the instant offense, he began by stating, "Eighty percent of the court transcript is wrong. Only twenty percent is correct."

Inmate Singh talked at length about his relationship with his wife prior to the instant offense. He indicated that they had been separated twice, and that he had taken her back. He then said, "She come to me. She was high on drugs. She is only violent on drugs. No one knows what happened to the money. I have no idea. I never thought it would happen like this. It was going to be a party. I am……how do you say in English……a black sheep. All my family are good. This is very bad. I feel very sorry. It should not have happened like this. Why her? We have no control on destiny. She left me two times, but I took her back. This would not happen but for drugs, but I forgive her. The Bible says "truth lives forever." I tell the truth."

After several attempts to obtain specific information about the offense, it became clear that inmate Singh was either unable or unwilling to give specific details. He frequently stated that he was so intoxicated at the time, he was unable to remember what happened. It is quite possible that this is the case. Inmate Singh volunteered, "I'd give my life to change it, but I can't." His eyes began to tear up, and he appeared genuinely remorseful. He stated several times that he was very, very sorry for what had happened.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A. In the Fresno County Probation Report for the instant offense, it is indicated that inmate Singh has no prior criminal history. Since his incarceration, inmate Singh has received no CDC-115 violations. He does have one very minor CDC-128A for returning late. As inmate Singh has been without a single CDC-115 during his 15 years of incarceration, his violence potential within a controlled setting is estimated to be significantly below average relative to other Level II inmate populations.

B. If released to the community, his violence potential is estimated to be no more than the average citizen in the community. I base this opinion on the following:

The record indicates that inmate Singh claims U.S. citizenship since 1971. It also indicates that he was a long-time employee of PG&E. The record further states that his first marriage ended in divorce in 1978. Throughout this long period, there is absolutely no indication that inmate Singh engaged in any criminal behavior, nor is there any indication that he had a significant alcohol abuse problem. This is strongly reinforced by his total lack of a criminal history. It is important to note that he became divorced from his first wife during this period. This lack of arrests strongly suggests that violent behavior is not inmate Singh's response to the breakup of a marriage.

It is of some note that inmate Singh's description of the instant offense is somewhat different to this writer, as compared to previous writers of BPT reports. Although he accepted responsibility for his wife's death, he minimized that responsibility by stating that she was under the influence of drugs, and that's why she was assaulting him, suggesting that he originally began by defending himself from her assaults. His explanation is somewhat self-serving, and lacks credibility, as she was the only person with significant injuries.

It is hard to justify 19 stab wounds as "defensive" on inmate Singh's part.

In some cases, defendants minimize charges as a way of escaping punishment for their acts. In some cases, they do it because the offense is insignificant to them. It appears that for inmate Singh, his minimizing of his responsibility may be rooted in his inability to accommodate this horrendous act with his personal view of himself. Stated another way, inmate Singh appears to have great difficulty in understanding how a person like himself could possibly have committed such an offense.

It is also interesting to note that, in the Parole Board report of 1999, Dr. Terrini had a similar opinion. He wrote, "I am in agreement with one of the conclusions from his 1998 BPT psychological evaluation, which stated, 'I have seldom seen a less likely murderer.'"

It is my opinion that inmate Singh minimizes his behavior not as a way of minimizing the seriousness of the offense, but rather attempting to accommodate this horrendous event in his personal view of himself.

As a result of all of the above, I hold the opinion that his violence potential is estimated to be no more than the average citizen in the community.

C. Previous clinicians who have prepared Board reports have indicated that the only possible significant risk factor which could be a precursor to violence for this inmate would be continued abuse of alcohol. They went on to say that, although it is very unlikely that this man will ever commit another violent offense, should he again become severely intoxicated, his violence potential would be considered to be higher. Obviously, it is impossible to disagree with such a statement. However, an assessment of his probability to become intoxicated appears to be what it is that the Board of Prison Terms is seeking.

There is no indication from his alcohol consumption history offered through the Central file, the Fresno Probation Report, his criminal history, or his own statements which indicate that inmate Singh can be classified as an alcoholic. All indications appear to indicate that the alcohol intoxication that he reports at the time of the instant offense was the result of situational events, and not a chronic alcohol disorder.

The question then becomes, how likely is this situation to reoccur? It is clear from inmate Singh's divorce from his first wife that divorce is not a precipitator. It must be assumed, then, that it must have been a unique set of characteristics in the relationship between inmate Singh and his deceased wife which contributed to his alcohol abuse, and the resulting offense.

Inmate Singh is now more than 15 years older, and has matured considerably. It is quite possible that, given the exact same set of circumstances at the time of the offense, his response would be considerably different.

What can be said is that the unique set of circumstances which resulted in the murder of his wife are currently unlikely to occur. Inmate Singh is now 62 years of age, and unmarried. It is the opinion of this writer that the murder of inmate Singh's wife was situational in nature, as was the alcohol consumption, and are not indicative of future violence potential.

## XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

**A.** Inmate Singh is completely competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has done so during his incarceration period.

**B.** This inmate does not have a mental health disorder which would necessitate treatment, either during his incarceration period, his parole period, or following parole.

C. There is no indication that inmate Singh had an ongoing alcohol abuse problem. It appears clear that his intoxication at the time of the offense was a considerable contributory factor, however. Inmate Singh has completed approximately 15 years of Alcoholics Anonymous participation, and has received numerous laudatory chronos. This notwithstanding, I would recommend upon parole:

1) Abstinence from all alcohol and illegal substances be required.

2) Alcohol monitoring be provided by the parole agent.

3) It is my opinion that any gain that Alcoholics Anonymous would provide for this inmate has already been achieved. As a result, continued Alcoholics Anonymous attendance while on parole is not recommended.

4) I am in agreement with previous clinicians who have completed Board of Prison Terms reports that inmate Singh is unlikely to commit future violent acts, either in custody or in the community.

**S. SEXTON, Ph.D.**
**Contract Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

SS/gmj

D: 12/30/02
T: 01/08/03

**MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**APRIL 2002 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**JANUARY 8, 2002**

Inmate Rigbir Singh, CDC# D-54338, was seen for a mental health evaluation for the Board of Prison Terms by Steven J. Terrini, Ph.D., Staff Psychologist at CTF, on 12/30/99 for the April 2000 Lifer Calendar.

According to the agreement that CDC psychologists made with the Board of Prison Terms, once a mental health evaluation is completed in the new format, revised in August 1998, a new evaluation is not necessary each time the inmate appears before the Board of Prison Terms.

Therefore, a mental health evaluation was not conducted at this time.

Bill Zika, Ph.D.

**BILL ZIKA, Ph.D.**
**Senior Supervising Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D: 01/08/02
T: 01/08/02

**MENTAL HEALTH EVALUATION**
**FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**APRIL 2002 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**MAY 9, 2002**

The Board of Prison Terms requested a new, full, psychological evaluation on inmate Rigbir Singh, CDC# D-54338. A Hindi interpreter was available for this evaluation. However, inmate Singh said his attorney advised him only to discuss his parole plans. Therefore, a complete, full, psychological evaluation could not be completed at this time. Inmate Singh's Correctional Counselor I was notified of this meeting.

**JOE REED, Ph.D.**
**Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

JR/gmj

D: 05/09/02
T: 05/10/02

EXHIBIT F

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY ARNOLD SCHWARZENEGGER, Governor

DEPARTMENT OF CORRECTIONS
Parole and Community Services Division
P.O. Box 942883
Sacramento, CA 94283-0001

This is in response to your recent letter requesting information concerning parole programs that are available to you upon your release. I commend you for taking the initiative to obtain this information.

The fact that you have no place to live or work does not have a bearing on your release to parole. To assist parolees with their rehabilitation while on parole, the Parole and Community Services Division (P&CSD) has developed and implemented numerous community-based programs. These include employment assistance services, computerized learning centers, residential facilities that provide multiple services to homeless parolees, and substance abuse treatment programs.

Currently, The P&CSD administers three employment programs, which are located throughout the State. One of these provides employment assistance services through State Employment Development Department job specialists, who are located within selected parole offices. Another program, the Offender Employment Continuum, helps parolees become self-sustaining by providing them with referrals to educational programs, vocational training and prospective employers. Additionally, the OEC works closely with the Prison Industry Authority (PIA) to assist parolees who have participated in PIA programs to find meaningful employment. The Parole Employment Program provides employment services such as workshops and job placement assistance to parolees through community providers.

In addition to the employment programs, there are the Computerized Literacy Learning Centers (CLLC) where a parolee can advance from early education through 12th grade and/or obtain a General Education Development Certificate. CLLCs are located within selected parole units throughout the State.

P&CSD also provides services to homeless parolees through Residential Multi-Service Centers (RMSC) which are located in Bakersfield, Fresno, Los Angeles, and Stockton. This community-based program provides lodging, meals, individual and group counseling, substance abuse counseling, parenting skills training, money management, life skills training and medical referrals. Assistance is also provided in obtaining Social Security cards and Department of Motor Vehicles identification. Other

services include job search and job retention training, and assistance in finding and obtaining employment. During transition planning, staff provides program participants with assistance in locating permanent housing in the community.

For parolees who have a history of substance abuse, the P&CSD operates several substance abuse treatment programs. These are located throughout the State and include the Substance Abuse Treatment and Recovery Program and the Parolee Services Network.

Programs and services are free of charge to all parolees. However, to access them, parolees must coordinate their enrollment through their assigned parole agent. After you have been assigned a parole agent, I encourage you to contact him or her for assistance in locating specific resources that may be available to you in your community.

I am enclosing a copy of the Parolee Information Handbook. The handbook identifies, to a limited degree, local service agencies and qualifying factors. It also outlines typical benefits such as clothing, housing, financial assistance and bonding for employment, which some parolees may or may not be eligible for.

When completing your pre-parole plans, Release Program Study (CDC Form 611), with your assigned correctional counselor, you should discuss any parole issues you may have including changes in your county and out-of-state parole. I also recommend that you request, through your correctional counselor, participation in the institution's Pre-release Program.

I hope you find this information helpful.

Sincerely,

DL LaMotta

D. L. LAMOTTA
Chief, Program Support Unit
Parole and Community Services Division

Enclosure

cc: Correctional Counselor

EXHIBIT G

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**PRESIDING COMMISSIONER KOENIG:** We've reconvened the panel hearing of Rigbir Singh. All participants are present who were present prior to the recess. The panel unanimously finds the Prisoner unsuitable for parole and we do feel he would pose an unreasonable risk of danger to society if released at this time for the following reasons. The first reason, is it's a very violent crime that the Prisoner committed. A crime where the Prisoner was in a domestic quarrel with his 21-year-old wife, cut and stabbed his wife to death, cutting her throat and stabbing her 19 times or multiple times. The Prisoner then left the Victim to die, when to his brother-in-law's residence, initially lying to his brother-in-law about the murder. Then attempted to coerce the brother-in-law to get rid of the body, to bag and dispose of the body. Second reason is that the prior social factors of the Prisoner. Although the Prisoner had no prior criminal record, he did involve himself in marijuana and alcohol usage, possibly drinking at the time of the crime. There is also indications that there was prior abuse of the wife and that he hit her previously. It's also indicated that the police responded to the residence

several times because of there being domestic quarrels. Third reason is a lack of sufficient parole hearings since he's been in the institution. It's noted that he has been in academics for a long period of time and he has upgraded himself dramatically for the hearing and we commend him for that and also commend him for being disciplinary free since he's been in the institution and note that his class score is zero. He needs additional participation in the AA area. Always participated to a degree in that particular area, but he has not adequately programmed in the 12-Step area of AA. We note that he has participated in board and transcendental areas. Also, the Breaking Barriers. However, he has never completed a vocation since he's been in the institution. The fourth reason is the psych report dated 3/20/95 by Wagner. "(Inaudible) not conducive to parole at his particular time." Dr. Wagner states that "Prisoner does not have much insight into the nature of his crime. He's at a loss to explain it." The panel finds that considering the nature of the crime that the Prisoner committed, the very violent murder of his wife, the cutting of the Victim's throat, multiple stab wounds. Also, his alcohol and marijuana abuse, prior abuse of his wife, the Prisoner's mitigation of the murder, and continuing to

justify his actions, using alcohol and self-defense to mitigate the horrible murder he committed. Considering all of these, there is not sufficient evidence that the Prisoner would behave differently if released from prison at this particular time. In a separate decision, the panel finds that it is not reasonable to expect that the Prisoner will receive a parole date during the following three years. This is a three-year denial. And the reasons are the violent crime that the Prisoner committed, his prior abuse of his wife and domestic quarrels that he engaged in. Also, the need for additional programming and the negative psych report at this period in time. (Inaudible) is for the three-year denial. In the ensuing three years, the panel asks that you remain disciplinary free and that you upgrade in the educationally or also attempt to get a vocation and participate in self-help and therapy, particularly AA or any other self-help program. If you get a one-on-one therapy with the doctor, it would be good for you to come to understand why you committed the crime and maybe to think a little bit about how that crime occurred. This concludes the reading of the decision. Mr. Giaquinto?

**COMMISSIONER GIAQUINTO:** Nothing.

**PRESIDING COMMISSIONER KOENIG:** Mr. Foster?

**DEPUTY COMMISSIONER FOSTER:** Nothing, thank you.

**PRESIDING COMMISSIONER KOENIG:** All right. Here's a copy of the decision, Mr. Singh? Good luck to you.

--oOo--

**PAROLE DENIED THREE YEARS** OCT 0 2 1995

**EFFECTIVE DATE OF THIS DECISION** ______________________

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, MICHELLE MADISON, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 55, and which recording was duly recorded at CALIFORNIA STATE PRISON, SOLANO, VACAVILLE, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING OF RIGBIR SINGH, CDC No. D-54338, on MAY 17, 1995, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 15, 1995, at Sacramento, California.

Michelle Madison

MICHELLE MADISON
TRANSCRIBER

EXHIBIT     H

**CALIFORNIA BOARD OF PRISON TERMS**

**D E C I S I O N**

**PRESIDING DEPUTY COMMISSIONER KOENIG:** We've reconvened the Panel hearing on Mr. Rigbir Singh. All participants are present who were present prior to the recess. The Panel unanimously finds the prisoner unsuitable for parole and we do feel he'd pose an unreasonable risk of danger to society if released at this time for the following reasons. The first reason is the very violent crime the prisoner committed. It's a crime where the prisoner because of extreme jealousy and alcohol usage murdered his wife stabbing her to death. The prisoner stabbed the victim approximately 19 times, also slit the victim's neck. This, I believe, was committed in front of the four-year-old son. Noted that the prisoner had abused his wife before. Also there's an attempt to sway the, I believe, brother-in-law to help him dispose of the body. However, it is noted that the prisoner instead then changed his mind and turned himself in to police sometime later. The prisoner has had no prior criminal record that we know of. However, he was in the Fiji Islands up until age 27 when he came to the United States. And we know that he has not had a criminal record in the United States prior to the instant offense. And evidently he has worked and

provided a living for his family. The second reason for the denial is his lack of sufficient programming. And it is noted that the prisoner has been disciplinary-free. We commend the prisoner for that, knowing that he gets along well with other prisoners and the staff. We note that he has programmed in Breaking Barriers ward, Men's Violence Program. However, he has not completed a vocation as was deemed necessary. He also has evidently programmed in AA, but is not familiar with the 12 Step Program. Now, this may be because of his mental capacity. However, we suggest that next time he comes before the Board, that possibly he can bring a book with him and explain to the Board what he understands about the 12 Step Program. The psych report by Claire, staff psychiatrist, authored on March 9th, 1998, is generally a positive report. However, I have a hard time agreeing with the doctor in that the doctor feels that alcohol had a major part of the murder in that the prisoner may have blacked out. I have a hard time -- This Panel has a hard time agreeing with the doctor in that the prisoner did drive a car prior to the instant offense, noting that he couldn't have had a lot of alcohol if he could drive a vehicle. However, Arthur, the CCI -- that's A-R-T-H-U-R -- states the prisoner would pose an unpredictable degree

of threat to society. The Panel finds that when we consider the violent offense the prisoner committed, because of extreme jealousy and alcohol usage that he murdered his wife, and the violence involved, the 19 times he stabbed her, also slitting her neck -- When we consider the need for additional programming in the institution, there's not sufficient evidence at this time that the prisoner would behave differently if released from prison. In a separate decision, the Panel finds that it's not reasonable to expect that the prisoner would receive a parole date during the following two years. This is a two-year denial. And the reasons are the crime he committed and the lack of sufficient programming. In the ensuing two years we ask that he remain disciplinary-free, that he attempt to get a vocation, that he participate in self-help, any type of self-help, particularly AA and/or NA, even if it's studying in his cell the 12 Steps, and indications to the Board next time that he has done this, that he's familiar with that 12 Step Program. This concludes the hearing. I wish you good luck, Mr. Singh. Okay. Again, I want to commend you for being disciplinary-free and continue that.

--oOo--

**PAROLE DENIED TWO YEARS**

**EFFECTIVE DATE OF THIS DECISION** JUN 1 1998

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, ROSEMARY J. PARLIN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 32, and which recording was duly recorded at CALIFORNIA STATE PRISON, SOLANO - at VACAVILLE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RIGBIR SINGH, CDC No. D-54338, on April 27, 1998, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 22, 1998, at Sacramento, California.

Rosemary J. Parlin
Rosemary J. Parlin
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT "I"

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**PRESIDING COMMISSIONER DALY:** We'll let the record reflect that we are back in session and it is 11:05. Everyone is in the room with the exception of Mr. Bordonaro, who is out of the room. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The offense was carried out in an especially cruel and callous manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. And the motive for the crime was inexplicable or very trivial in relation to the offense. These conclusions are drawn from the Statement of Facts wherein the prisoner had an argument with his wife, grabbed her, cut her throat and stabbed her 19 times. The prisoner has an unstable social history which includes alcohol abuse. The prisoner has programmed in a limited manner while incarcerated.

**INTERPRETER CABALAN:** Could you repeat that.

**PRESIDING COMMISSIONER DALY:** The prisoner

has programmed in a limited manner while incarcerated.

**INMATE SINGH (Through Interpreter):** Can you explain that, the operating, what that means.

**PRESIDING COMMISSIONER DALY:** Okay, just that he's had limited vocational classes and things like that that he's taken, so I'll go on from here. He has not sufficiently participated in beneficial self-help or therapy programs. Okay, the psychiatric-psychological report, dated January 27th of 2000, and authored by Dr. Terrini, T-E-R-R-I-N-I, okay, is not totally supportive in that he cites the only possible -- if released to the community his violence potential is clearly estimated to be no more than the average citizen in the community, but the only risk factor for this inmate as a precursor to violence would be the continued abuse of alcohol. He says, although it is very unlikely that this man will ever commit another violent offense, should he again become severely intoxicated, his violence potential would be considered to be much higher. The Hearing Panel notes that responses to PC 3042 notices indicate opposition to a finding of parole suitability, specifically from the District Attorney of Fresno County. The Panel makes the following findings:

The prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others. Nevertheless, the prisoner should be commended for his taking part in Breaking Barriers, Men's Violence Prevention chronos, Victim Offender Reconciliation, and for his participation in NA, and also the fact that he has been virtually disciplinary-free throughout his entire incarceration. The Panel recommends that the prisoner remain disciplinary-free; and if available, upgrade vocationally and educationally; and if available, participate in self-help and therapy programming. Okay, the Panel's belief that the prisoner's current mental health is an important issue and a new full evaluation, the Panel requests the clinician specifically address the following, and this is regard to a new psych: The prisoner's violence potential in the free community and the significance of alcohol as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use or abuse of the same when released. Okay, and that concludes the hearing today at 1:12 p.m.

Mr. Bordonaro stepped out of the room without

having signed this so we'll see if we can get a signature on it and give --

**ATTORNEY SPOWART:** Did I miss something? How many year denial?

**PRESIDING COMMISSIONER DALY:** One. The hearing is concluded, thank you.

**ATTORNEY SPOWART:** I want to thank the Board for their comments.

--oOo--

PAROLE DENIED ONE YEAR

EFFECTIVE DATE OF THIS DECISION APR 3 0 2001

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, PATRICIA A. PREVINI, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 41, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RAGHBIR SINGH, CDC No. D-54338, on April 4, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated April 23, 2001 at Sacramento County, California.

Patricia A. Previni
Transcriber
**CAPITOL ELECTRONIC REPORTING**



# EXHIBIT

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**DEPUTY COMMISSIONER BLONIEN:** We are back on record.

**PRESIDING COMMISSIONER MUNOZ:** All right. Thank you. It's 25 minutes before 12 noon. And the parole consideration hearing for inmate Singh has resumed with all parties having returned to the hearing room. And Mr. Singh, this Panel reviewed all information received from the public and relied on the following circumstances in concluding that you are not suitable for parole and that you would pose an unreasonable risk of danger to society if released from prison at this time. Many factors were considered. First and foremost was the commitment offense and the nature of that offense. This offense was carried out in a cruel, vicious and brutal manner with a callous disregard for human suffering. This victim was abused during the commission of her murder. She was stabbed multiple times. And the motive for this crime was trivial in relation to the offense. These conclusions are drawn from the Statement of Facts wherein the prisoner was involved in a stormy marriage, according to our records, and had taken his wife back after a separation. They were in the midst of

planning a birthday party for their son. And the inmate had been drinking and somehow an argument developed and the argument escalated. During the course of the argument, according to our reports, this inmate pulled the victim to the floor by her hair and then cut her throat with a knife, then proceeded to stab her a multitude of times. This cowardly act was committed in the presence of their four-year-old son. And this Panel feels that this inmate played a direct role in the demise of a human being. As far as criminal behavior, there's no record of any criminal behavior in regards to this inmate. And that also reflects in his institutional behavior. He's behaved himself well while incarcerated. He has no 115s and only one 128(a). And that's how we expect inmates to behave, sir. And as far as the most recent psychological evaluation, the evaluation with a date December 30th, 2002, that is a good report. It was reviewed during the course of this hearing. Again, it was a good report. Your parole plans appear to be in order. Parole plans are to return to Fresno County and upon discharge return to your homeland. We received no responses to 3042 of the Penal Code. We make the following findings: That this inmate needs to stay on the path that he's on.

He needs to participate in any and all self-help programming that may become available. We appreciate the gains that the inmate has exhibited while incarcerated and that's a reference to this behavior. And we certainly hope you stay on track. You should be commended for that behavior and also for your participation in AA. You've had some participation in other self-help programs in other years. And we appreciate that. However, these positive aspects of your behavior do not outweigh the factors of unsuitability. This Panel recommends that you remain disciplinary-free as I indicated. I talked about your self-help. And what I -- what I intend to do -- what I overlooked reading when I read the -- our decision -- what I indicated that our conclusions are drawn from the Statement of Facts, what I intended to read, according to my notes, but I failed to do that, just mostly as a matter of clarification in regards to the injuries that your wife, the victim of this murder, suffered, there is a reference on page three. And I don't know whether your client wants to use this or not, but I'm going to read it into the record. So you might advise him that I'm going to read something he may not want to hear. He may want to cover his ears or something. On page three

of the probation officer's report, the evaluator writes -- or the probation officer writes that the doctor said that:

"The wound of the neck was more of an incision wound rather than a stab wound since it was longer than it was deep. The doctor said that it represented about three inches long. The doctor further said that the torso of the body showed at least three stab wounds to the left side of the chest. The doctor said the one wound -- that one wound penetrated the chest cavity and went into the heart traveling about four and one-half inches. The doctor stated that the cause of death was a combination of a hemorrhage and blood loss from the wounds of the neck and of the heart. The doctor also stated that he found a defense wound to the left thumb -- that it was a superficial V-shape cut. The doctor further stated that the victim sustained a total of 20 stab wounds."

And that concludes the reading of the decision.

And Ms. Blonien, any comments you care to make, Ma'am?

**DEPUTY COMMISSIONER BLONIEN:** None.

**ATTORNEY SPOWART:** Commissioner, before we go off the record, can we request the Panel asks in the next hearing a copy of the police report or the pathologist report. My client has been adamant that it should read only nine -- and he said this was stated in the court, he never stabbed her 19 or 20 times. And (indiscernible) clear that up because since you just brought it up, that seems to be a significant factor. I would ask that the pathologist report or police report be included and (indiscernible) because this just came from the -- from what I gather -- came from the probation officer's report. And they're not always that accurate.

**PRESIDING COMMISSIONER MUNOZ:** Yeah. What I read was the probation officer's report.

**ATTORNEY SPOWART:** Yeah.

**PRESIDING COMMISSIONER MUNOZ:** That's correct. Yes, we can make that request and we'll do that.

**ATTORNEY SPOWART:** Thank you.

**PRESIDING COMMISSIONER MUNOZ:** Okay. Thank you. That concludes your -- the hearing for your

client, Mr. Spowart. This is his copy. Thank you both for being here this morning. It's 18 minutes before 12:00 noon. And thank you, ma'am, for your assistance.

**INTERPRETER MOHAN:** Sure.

**PRESIDING COMMISSIONER MUNOZ:** We appreciate it.

**INTERPRETER MOHAN:** Thank you.

**INMATE SINGH:** Thank you.

**INTERPRETER MOHAN:** You're welcome.

**PRESIDING COMMISSIONER MUNOZ:** All right. Good luck.

--oOo--

PAROLE DENIED

FINAL DATE OF DECISION JUL 29 2003

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, PATTY DAVIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 50, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RIGHBIR SINGH, CDC No. D-54338 on APRIL 30, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 19, 2003, at Sacramento County, California.

Patty Davis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT   "L"

CALIFORNIA BOARD OF PAROLE HEARINGS

D E C I S I O N

**PRESIDING COMMISSIONER SAWYER:** The time is 5:42 the panel has reviewed all the information received from the public and relied upon the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or threat to public safety if he was released from prison. I am going to read the summery of the crime that is significantly different than the prisoner's version. It was June 28, 1986 inmate Singh and the victim were planning a birthday party in the kitchen for their four-year-old son. Which was to take place the following weekend. They began arguing over her infidelity and the broken lunch engagement. The victim son Jason Singh was sitting in the living room when he heard his mother and father arguing. He heard his father call his mother a hooker and other nasty names. He entered the kitchen where he saw his mother trying to get away from his father. His father grabbed her hair pulled her down to the floor, took the knife and slit his mothers neck. The son tried to help his mother but was ordered by his father

to go the neighbors home. The son went to the neighbor who sent him to his uncle Jans home. The son informed him of the argument between his mother and father he told his uncle that his mother might be dead. Singh continued to stab his wife approximately 19 times, subsequently left his home drove his car to his brother in laws house, Jan. He told Jan that he and his wife had a dispute. Jan asked his brother in law if he had killed his wife, noticing that he had blood on his chest. Singh replied no. Jan told Singh he must be lying, Singh then admitted that he might have murdered his wife and that he needed his help. He wanted to bag her up and dump her somewhere. Jan told him he would rather not get involved and that he better take himself to the police station. And in reading the prisoners version of this crime the, it happened all together a different way. He was defending himself she had the knife. We feel this offense was carried out in a manner which demonstrated exceptionally callous disregard for human suffering. It must have been a horrible sight, not only for the victim of course to be killed in that passion but for the son too witness this event. I can't help but believe

that he will be scared for life. The motive for the crime was inexplicable. In that Mr. Singh's history he was divorced once before and his marriage wasn't going well so he got divorced, so he knows that was an option. It certainly was an option to taking matters into his own hands. Of course he was, admittedly he was under the influence or was had been drinking I should say. And there is just two versions to this story. And of course Mr. Singh's version is minimized completely, very minimized. And in this last paper that was submitted today he is wanting to point fingers that nobody told him he could get an interpreter and he wasn't mirandaized and you know everybody is lying about the events that happened but there is just two versions to this offense. Previous records as indicated there are none, no previous history of violence. That is what makes this crime particularly horrific. Institution behavior is to be commended one 128 and you have had no 115's. 17 years disciplinary free. That tells us a lot that is very positive. The psychiatric report done January 8, 2003 and I am quoting some the same that the inmate's attorney quoted. In regards to minimizing, I am not sure he is

using it the same way I would. But I think it gives us some insight, in some cases defendant minimizes charges as a way of escaping punishment for their acts, in some cases they do it because the offense is significant, is insignificant to them. It appears that for inmate Singh he is minimizing of his responsibility maybe rooted in his inability to accommodate this horrendous act with his personal view of himself. Stated another way inmate Singh appears to have great difficulty in understanding how a person like himself could have possibly committed such an offense. Then he goes on to say as a result of all of the above they hold the opinion that violence potential is estimated at to be no more than the average citizen in the community. So I think he is talking a little bit about the minimization of the lack of insight into Mr. Singh's responsibility here. By changing the events that happened. But he also realized and feels that he is no more likely than the average citizen in the community to be violent. He has viable residential plans in the last county of residence with his sister. And he feels due to his age of 65 he's not employable or marketable.

He does have a history of owning his own company, a janitorial service. And quite frankly 65 is not that old. I am four years away from that and I am working 12 hours a day so it is all in what you want I guess. Fresno County opposes a parole date. You have had exceptional reports sir from the clothing room where you work. You've done 17 years in AA as your attorney said AA, we talk about it all the time because it is probably the most readily available therapy that if you follow the tenants of AA you don't have to follow all the tenants because I know some of them are religious based. But overall it is a great program. However these positive aspects of your behavior doesn't outweigh the factors of unsuitability in this particular crime which was horrendous, callous. We feel that Mr. Singh lacks insight into the crime he has indicated as he has said today, he made a mistake. I look at it as far larger than making a mistake. I look at it as killing a wife is more than merely a mistake. We are denying his parole for one year. Commissioner?

**DEPUTY COMMISSIONER FILANGERI:** Just a few words if I may please. Mr. Singh you minimized your role and responsibility in the commitment

offense by blaming your wife for infidelity and substance abuse. You criticize the accuracy of the details in the court transcript. In the fairness of the proceedings. You claim you blacked out before the victim was stabbed and only regained consciousness after the incident. You wrote a bold statement to the former chairwoman of the Board of Prison Terms, quote if you lie everybody believe it, if you tell the truth nobody believe it. Apparently motivated to convince the board of the accuracy of your self-serving version of the commitment offense. However your AA participation while insisting you are not an alcoholic tarnishes your credibility. You seem completely unwilling to come to grips with the commitment offense. The reason you are in prison today. This lack of insight combined with questionable credibility prevents me from concluding your release would not pose an unreasonable risk to public safety. That is all.

**PRESIDING COMMISSIONER SAWYER:** Thank you, our recommendation is obviously stay disciplinary free, no 115's or 128's. And continue to earn those positive chronos for your good work you do in the clothing room. That

concludes this hearing the time is 5:51.

--oOo--

PAROLE DENIED ONE YEAR:

THIS DECISION WILL BE FINAL ON: DEC 2 9 2005

YOU WILL BE PROMPLTY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, JENNYFER OSECHECK, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 -52, and which recording was duly recorded at CALIFORNIA TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF RIGBIR SINGH, CDC NO. D-54338, ON AUGUST 31, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 3, 2005, at Sacramento, California.

Jennyfer Osecheck

JENNYFER OSECHECK
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT "C"

# EXHIBIT "M"



# CERTIFICATE of COMPLETION

This Certifies That

Raghbir Singh

Has Successfully Completed

23 Day Of October 19 92

## BREAKING BARRIERS PROGRAM

D-54338

GREAT SEAL OF THE STATE OF CALIFORNIA
EUREKA
The Pacific Institute

Program Manager

Juan Arevalo

Facilitators

# "WITH THE NAME ALLAH,
# THE MOST GRACIOUS, THE MOST MERCIFUL"
# MILATTI ISLAMI
# (THE PATH OF PEACE)

O you who believe Intoxicants and Gambling, Dedication to stones, and Divination by arrows are evils of Satan's handiwork. Avoid such evils that you may prosper, Satan's plan is (but) to excite hostility and hatred between you with intoxicants and gambling and hinder you from the remembrance of Allah, and from prayers, will you not abstain (5:90 & 5:91).

**THIS CERTIFICATE IS TO ACKNOWLEDGE**

R. SINGH

**For his participation in the twelve-week Seminar Sessions of Milatti Islami (The Path of Peace).**
**A twelve step Recovery Program for problems associated with addictions.**

11/17/99
Date

MUSLIM CHAPLAIN

GROUP FACILITATOR

# INSTITUTE FOR SOCIAL REHABILITATION

This is to certify that

RAGHVIR SINGH

has completed the 12-week course in
"Consciousness: The Field of All Possibilities"
at CMF–South, Vacaville, California
including twice daily practice of the Transcendental Meditation (TM) technique.

TM is a simple, natural, effortless mental technique practiced twice daily for twenty minutes sitting easily with the eyes closed. Over 500 research studies conducted in over 160 universities and research institutions around the world have documented the effects of the TM program in unfolding full human potential. The key to success is the regular practice and understanding of the growth of higher states of awareness, whose benefits include increased intelligence and creativity, decreased stress and tension, improved social relations and self-esteem, and world peace.

*"Transcendental Meditation opens the awareness to the infinite reservoir of energy, creativity, and intelligence that lies deep within everyone. This is the unified field of all the laws of nature — pure consciousness — which underlies and promotes the progress and evolution of life everywhere.*

*"By enlivening this most basic level of life, Transcendental Meditation is that one simple procedure which can raise the life of every individual and every society to its full dignity, in which problems are absent and perfect health, happiness, peace, and a rapid pace of progress are the natural features of life."*

*— Maharishi Mahesh Yogi, founder of the TM program*

*Given this 8th day of September, 1991*

INSTRUCTOR

Stuart Moody
REGIONAL DIRECTOR



Singh - D54338

# A. C. T. S.

**Alcohol / Chemical Treatment Series**

*Certificate of Participation*

***This certifies that***

R. Singh

***has completed*** Twelve ***hours of***

***Chemical Dependency Training***

**Instructor** B. Chambers

**Date** S. Chambers

• National Headquarters •
8855 Dunn Road • Hazelwood, Missouri 63042-2299

© GOES 137



# Men's Violence Prevention Program

*be it known that*

MR. RAGHBIR SINGH

*has successfully completed*

MEN'S VIOLENCE PREVENTION

**ATTESTED TO THIS**

JANUARY 6, 1998

M.R. Brewer
**Sponsor**

Naleem Washington
**Facilitator**

Betty Lewis
**Sponsor**

**Facilitator**

# Efficiency Award

FOR PARTICIPATION IN THE FOLLOWING WORKSHOPS:

" STRESS MANAGEMENT , CONFLICT RESOLUTION , PARENTING SKILLS , VALUES CLARIFICATION "

**MR. SINGH # D-54338**

THIS DOCUMENT IS TO ACKNOWLEDGE THE FACT THAT THE ABOVE NAMED INDIVIDUAL HAS SUCCESSFULLY COMPLETED THE AFOREMENTIONED WORKSHOPS AND HAS SHOWN GREAT PERSONAL SKILL AND KNOWLEDGE IN ALL AREAS OF COMPETENCY

CHAPLAIN / V.O.R.G. MANAGER

STEERING COMMITTEE REPRESENTATIVE

Scott S. Poole
Group Workshop
Facilitator

State Of California

# Certificate Of Participation

Is

Presented To

R. Singh

For 18 Months Participation In VORG

(Victim/Offender Reconciliation Group)

At CSP - Solano

VORG Program Manager

5 - 3 - 93

Date

EXHIBIT N

S154212

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re RAGHBIR SINGH on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

SUPREME COURT
FILED

JAN 23 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

HC07CRWR678280-GDH-cm

FILED
APR 0 9 2007
FRESNO COUNTY SUPERIOR COURT
By_______________
DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

CENTRAL DIVISION

| | |
|---|---|
| In re<br>RAGHBIR SINGH,<br>Petitioner<br>On Habeas Corpus. | No. 07CRWR678280 Dept. 71<br><br>ORDER |

Having considered the petition for writ of habeas corpus filed on February 28, 2007, the court finds that petitioner has not shown a prima facie case for relief.

Petitioner challenges the Parole Board's decision to deny his parole. According to the petition, on March 6, 1987, petitioner was convicted of one count of second-degree murder and sentenced to 15 years to life. The Board of Parole Hearings granted petitioner's parole on August 5, 2004, after having previously denied him parole several times. (Exhibit B to petition.) However, the Governor reversed the Board's decision.

On August 29, 2006, the Parole Board conducted another review of petitioner's case and denied his parole. (Exhibit A to

petition.) Whether or not this court agrees with the Board's conclusion, its decision may not be overturned so long as it is supported by "some evidence." (See, e.g., *In re Fuentes* (2005) 135 Cal.App.4th 152, *In re Shaputis* (2005) 135 Cal.App.4th 217, *In re Lowe* (6th Dist. 2005) 130 Cal.App.4th 1405, *Rosas v. Nielsen* (9th Cir. 2005) 428 F.3d 1229, *In re DeLuna* (2005) 126 Cal.App.4th 585, *In re Scott* (2005) 119 Cal.App.4th 871, *In re Van Houten* (2004) 116 Cal.App.4th 339, *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, and *In re Rosenkrantz* (2002) 29 Cal.4th 616.)

Here, the court finds that there was at least some evidence to support the Board's conclusion that releasing petitioner could pose an unreasonable risk to society or a threat to public safety, based on the violent nature of the original offense, and the Board's belief that petitioner fails to understand the nature and magnitude of his crime. (Decision, pp. 4, 5.) The facts on the record tend to show that the underlying offense was "especially heinous, atrocious, or cruel." Petitioner killed his wife by slitting her throat and stabbing her approximately 20 times. (*Id.* at p. 1, 2.) Petitioner's son was present when petitioner attacked the victim. (*Id.* at p. 1.) When the son tried to help his mother, petitioner sent him to his uncle's home. (*Ibid.*) Petitioner also tried to enlist his brother-in-law's help in disposing of the body. (*Id.* at p. 4.) Thus, there is at least some evidence to support the Board's conclusion that the crime was carried out in a manner demonstrating callous disregard for human suffering.

The Board also believed that petitioner fails to understand the nature and magnitude of his crime, and he continues

to blame his wife's adultery and alcohol for his actions. (*Id.* at p. 5.) There is at least some evidence to support the Board's conclusion here, since the psychological report dated January 8, 2003, noted that petitioner "frequently minimized his own responsibilities." (Exhibit E, p. 5.) Petitioner also stated to the psychologist that, "This would not happen but for drugs, but I forgive her." (*Id.* at p. 6.) The psychologist also noted that, "Although he accepted responsibility for his wife's death, he minimized that responsibility by stating that she was under the influence of drugs, and that's why she was assaulting him, suggesting that he originally began by defending himself from her assaults. His explanation is somewhat self-serving, and lacks credibility, as she was the only person with significant injuries." (*Id.* at p. 7.) Thus, the Board's conclusion that petitioner has not taken full responsibility for his crime appears to have at least some support in the record.

The Board also noted that petitioner has denied that he is an alcoholic, although he has participated in AA for over 17 years. (*Id.* at p. 2.) However, when the Board asked petitioner to recount any of the steps, he was unable to do so. (*Ibid.*) Petitioner also indicated that he had not taken any action on one of the steps. (*Ibid.*) Thus, there appears to be at least some evidence to support the Board's conclusion that petitioner has not

/////

/////

/////

/////

/////

engaged in sufficient self-help. Consequently, the court cannot overturn the Board's decision.

The petition is denied.

DATED this 9th day of ~~March~~ April, 2007.

M. BRUCE SMITH

~~GARY D. HOFF~~ M. Bruce Smith
Judge of the Superior Court

IN THE

# Court of Appeal of the State of California

IN AND FOR THE

# Fifth Appellate District

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

MAY 31 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By ____________________ Deputy

In re

RAGHBIR SINGH,

On Habeas Corpus.

F052874

BY THE COURT*:

The "Petition For Writ Of Habeas Corpus," filed in this court on May 18, 2007, is denied.

[signature] Acting P.J.

*Before Wiseman, Acting P.J., Cornell, J., and Kane, J.

**PROOF OF SERVICE BY MAIL**
**BY PERSON IN STATE CUSTODY**
(C.C.P. §§ 1013(A), 2015,5)

I, Raghbir SINGH, declare:

I am over 18 years of age and I am party to this action. I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California. My prison address is:

Raghbir Singh, CDCR #: D-54338
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: CW-308-L
SOLEDAD, CA 93960-0689.

On Feb. , 2008, I served the attached:

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTUDY.

???

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined. The envelope was addressed as follows:

CLERK of the COURT
U.S. District Court
Northen District
450 Golden Gate, Ave.
San Francisco, CA. 94102-3433

STATE OF CALIFORNIA
Department of Jusstice
Office of the Attorney General
455 Golden Gate, Ave.
San Francisco, CA. 94119

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on Feb. 29, 2008.

Raghbir Singh
Declarant

Raghbir SINGH
P.O. Box 689
Soledad, CA. 93960
CDC ID#: D-54338/CW-308-L

RECEIVED
MAR - 4 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CLERK of the COU
United States Dist
Northen District of Ca
450 Golden Gate, Ave.
San Francisco, CA. 94102-3483